In re BRADA MILLER FREIGHT
SYSTEMS, INC., Debtor.

NATIONAL LABOR RELATIONS
BOARD, Appellant,

v.

BRADA MILLER FREIGHT
SYSTEM, INC., Appellee.

In re BRADA MILLER FREIGHT
SYSTEM, INC., Debtor.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS OF
AMERICA; International Brotherhood
of Teamsters, Chauffeurs, Warehouse-
men and Helpers of America, Steel and
Special Commodity Haulers Local No.
124; International Brotherhood of
Teamsters, Chauffeurs, Warehousemen
and Helpers of America Local Union No.
543; National Labor Relations Board
Region 25; and Region 7; Ralph Proc-
tor; and Richard G. McCracken, Appel-
lants,

v.

BRADA MILLER FREIGHT SYSTEMS,
INC., Appellees.

Civ. A. Nos. 81–C–0432–S, 81–C–0433–S.

United States District Court,
N. D. Alabama, S. D.

Dec. 31, 1981.

Perry Winkler, Gen. Counsel for Special Litigation N.L.R.B., Washington, D. C., George M. Dick, Indianapolis, Ind., Gerry M. Miller, Goldbert, Previant, Uelmen, Gratz, Miller, Levy & Brueggeman, Milwaukee, Wis., Richard G. McCraken, Fillenwarth & Fillenwarth, Indianapolis, Ind., Wilbur G. Silberman, Robert Loeb, Silberman, Silberman & Loeb, Birmingham, Ala., Aileen A. Armstrong, N.L.R.B., Washington, D. C., for plaintiffs.

John Richard Carrigan, Balch, Bingham, Baker, Hawthorne, Williams & Ward, Jerry W. Schoel, Denaburg, Schoel, Meyerson & Ogle, Birmingham, Ala., for defendants.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

This bankruptcy appeal raises several unsettled and troublesome issues generated by the sometimes conflicting national policies embodied in this country's labor laws and the Bankruptcy Reform Act of 1978. Specifically, this Court must determine whether a Bankruptcy Court is empowered to (1) determine the existence *vel non* of unfair labor practices; (2) enjoin union and employee activity otherwise protected by the Norris-LaGuardia Act; and (3) stay NLRB proceedings, in the exercise of its discretion, and if so, the applicable legal standards governing the issuance of such discretionary stays. In addition, the appeal raises the question of whether the Bankruptcy Court for the Northern District of Alabama clearly erred in approving the rejection of the collective bargaining agreements between Brada Miller Freight Systems, Inc. and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and certain of its affiliated local unions. For reasons set forth in this opinion, the Court's response to the first two inquiries is in the negative; the last two questions are answered affirmatively.

## FACTUAL BACKGROUND

Brada Miller Freight Systems, Inc. ("the Company"), a wholly owned subsidiary of

Brada Miller, Inc., is a special commodity carrier which is regulated by the Interstate Commerce Commission. The principal materials transported are iron and steel. The Company is owned by Dean Cutsinger who acquired it from Art Belford in January, 1979. Mr. Cutsinger moved Brada Miller's general office from Kokomo, Indiana to Birmingham, Alabama. Accordingly, the general administrative functions (accounting, billing, payroll, central dispatch) are handled from the Birmingham office. Even though the general office is located in Birmingham, Brada Miller's principal operations are in the Midwestern states—a circumstance not uncommon in the industry.

When Cutsinger acquired the Company, it was operating an average of 550 motorized units on a daily basis, out of some 29 terminals in the Midwest. It generated $44,000,-000 of gross revenues in 1978; and daily gross revenues reached $180,000.

The Company is a signatory to the "National Master Freight Agreement and Central States Area Iron and Steel and Special Commodity Rider" and the "National Master Freight Agreement and Central States Area Local Cartage Supplemental Agreement".[1] These collective bargaining agreements, negotiated between the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters") and employer associations of which the Company is a member, are effective for the period April 1, 1979 to March 31, 1982. The Company has recognized the Teamsters since 1955.

The Company has two types of employees—owner operators and city or terminal drivers. The owner operator owns the equipment and drives it himself. He is allowed three percent of the gross revenues. The city or terminal driver picks up and delivers loads in six of the Company's twenty-nine terminal areas. Under the collective bargaining agreement these drivers are paid a $10.53 per hour base wage plus $.95 for cost of living, totalling $11.48 per hour.

---

1. This agreement apparently covers nine local cartage drivers at the Company's terminals in Marion, Anderson, Indianopolis and Kokomo, Indiana; Detroit and Lansing, Michigan.

In addition to their wages, the Company's employees are provided several fringe benefits. The Health and Welfare fund costs the Company $36.50 a week per employee. If an employee works during the week, he is entitled to that sum regardless of the number of hours that he worked. The Pension Fund costs $46.00 a week per employee. Employees are entitled to ten holidays at an eight-hour day hourly rate. Employees are also allowed a maximum of three days funeral leave and five days sick leave all paid as eight-hour days. The city drivers are entitled to between one and five weeks vacation per year paid as forty-five-hour weeks.

Aside from its monetary contributions to provide these fringe benefits, the Company incurs further costs as a result of the collective bargaining agreement. It subscribes to Motor Carriers Labor Advisory Counsel (MCLAC), an association which represents them at union hearings and negotiations. The MCLAC service costs the Company $14,500 for one year of representation. Harold Mathena, vice-president of operations and labor at the Company attends three to four grievance hearings outside of Birmingham each month for an annual cost of approximately $14,000.

The Company must maintain additional office personnel to handle the paperwork of complying with the collective bargaining agreement. This paperwork includes maintenance of a checkoff for individual local unions, filing Health and Welfare and Pension reports, and paying drivers on a two check system. One check is issued for wages, another for equipment rental.

Evidence before the Bankruptcy Court indicated that the Company must generate $32,000 per day to meet its obligations under the collective bargaining agreements.

Shortly after Cutsinger purchased the Company in January, 1979, a strike ensued which was not over until mid-May. From that time, there has been a gradual decline in the business of the Company. The month of July is particularly devastating financially because of plant closings for va-

cation, inventories and other reasons. These slow downs caused a substantial decrease in the Company's business.

Because the Company's market is the automobile industry, it was additionally damaged by declines in that industry. The slow-down in the automotive industry means less work for Brada Miller and, in turn, fewer loads for its employees to haul.

The Company showed a net operating loss of $188,000 for 1979; and by July, 1980, it had reduced the number of its daily operating motorized units by one-half. As of the end of August, 1980, the number of operating motorized units had been reduced by an additional one-half—from 225 to approximately 125.

To meet its daily operating expenses, and the requirements of the collective bargaining agreements, in 1980 the Company should have generated $102,000 daily in gross revenues.[2] In July-August, 1980, the daily gross revenues averaged one-third of this "break even" point. The Company's chief financial officer testified that by mid-October, 1980, the gross revenues of the Company could reasonably be expected to be approximately $70,000 daily.

In the summer of 1980, the Company considered and implemented various measures which would decrease costs and thereby increase gross revenues. Nonessential office and terminal personnel were laid off. Operating expenses were decreased or eliminated in the areas of insurance, overhead, selection of carriers and computer operations. It also resigned from MCLAC and contacted its creditors to ascertain whether they would accept less than 100% of the amounts due.

On August 1, 1980, the Company informed its terminal managers that it was planning to initiate bankruptcy reorganization proceedings, and that an effect of these proceedings would be to cancel the collective bargaining agreements. The terminal managers were specifically instructed to execute interim leases or independent con-

---

**2.** This figure is referred to as the Company's    "break even point."

tracts with the truckdrivers. Several such contracts were executed with various members of the Teamster locals; and in some instances, where Teamster members refused to sign the independent contracts, they were not assigned any work by the Company.

The Company along with the parent organization, filed reorganization petitions under Chapter 11 of Title 11 U.S.C. § 1101 *et seq.* in the Bankruptcy Court for the Northern District of Alabama on August 1, 1980. By application filed simultaneously with the petitions, the Company requested that the Bankruptcy Court approve its rejection of the collective bargaining agreements with the Teamsters. On August 5, 1980, the Bankruptcy Court entered an *ex parte* order authorizing the Company to reject the collective bargaining agreements ("union contracts"). Ten days later, on application of certain affected Teamster local unions, the Bankruptcy Court set aside its order approving the rejection of the union contracts and set a hearing for August 28, 1980.

Hearings on the Company's requested rejection of the union contracts were held on August 28, 29 and September 4, 5, 1980 in the Bankruptcy Court in Birmingham.

In the meanwhile, various Teamster locals had filed charges against the Company with the National Labor Relations Board's ("the Board") regional offices in Indianapolis and Detroit, contending that certain conduct by the Company related to its rejection of the union contracts constituted unfair labor practices. By the time of the first day of hearings in the Bankruptcy Court on the contract rejection issue, the Company had filed motions to enjoin the Board from proceeding on the unfair labor practice charges. These motions were opposed by the Teamsters and the Board.[3] The Bankruptcy Court did not act on the motions until December, 1980. On November 4, 1980, the Bankruptcy Court appointed a Trustee for the Company.

Following an investigation of the previously filed unfair labor practice charges, the Board's Indianapolis Regional Office issued a Complaint against the Company on September 3, 1980. Roughly three weeks later, on September 26, 1980, a separate complaint was issued by the Board's Detroit Regional Office. These complaints were consolidated for hearing and on November 24, 1980, a hearing was scheduled for December 8, 1980 in Indianapolis. The complaints basically alleged that the Company had committed unfair labor practices under § 8(a)(1) (interference, coercion, and restraint of employees), § 8(a)(3) (discrimination designed to discourage union membership), and § 8(a)(5) (refusal to bargain) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (3), (5).

On December 3, 1980, the Board filed an action for a § 10(j) injunction, 29 U.S.C. § 160(j), in the United States District Court for the Southern District of Illinois, Indianapolis Division. The complaint alleged reasonable cause to believe that the Company had engaged in, and was engaging in, unfair labor practices by

... (a) threatening ... employees with withdrawal of recognition of [their local union] ...; (b) telling [its] employees that [they] would be in contempt of a Federal Judge's order if they did not sign individual 31-day trip lease agreements; (c) ceasing local cartage operations at [its] trucking terminals located in ... Indiana and Michigan and discharging all local cartage employees [employed at these terminals]; (d) discharging [its] over-the-road driver employees employed at their terminals located in the states of Indiana, Michigan, Ohio, Kentucky, and Illinois; (e) conditioning the rehire and/or re-employment of said ... drivers upon [the] drivers' executing "independent contractor" agreements; (f) transferring work previously performed by their discharged local cartage employees to those over-the-road drivers who executed ... independent contractor agreements; and (g) failing to bargain in good faith with [the affiliated Teamster local unions].

**3.** The Board was granted leave to intervene pursuant to FRCP 24(b)(2).

The Board sought a show cause order directed to the Company, and other interim and permanent injunctive relief.

On December 4, 1980, the Company filed in the Bankruptcy Court a motion for a stay of the Board proceedings. The motion alleged that the administrative proceedings of the Board, as well as the action in the Indianapolis federal district court, "would divert indispensable resources of the [Company]", and disrupt its operations. On the following day, following an essentially *ex parte* hearing, the Bankruptcy Court entered an order staying the proceedings of the Board, and setting down the matter for hearing on December 11, 1980.[4] In its order, the Bankruptcy Court found that the Board proceedings "would substantially thwart and frustrate the operation of the [Company]" and its ability to effect a reorganization; and would frustrate the jurisdiction of the Bankruptcy Court. 8 B.R. 61.

Teamster Locals 124, 135 and 543 were granted leave to intervene, pursuant to their motion, on December 9, 1980.

A hearing on the motion to stay the Board proceedings was held on December 11, 1980. Only one witness briefly testified at this hearing.

On December 22, 1980 the Bankruptcy Court entered its Findings of Fact and Conclusions of Law. The factual findings of the Bankruptcy Court have been incorporated in this opinion, as there is no basis for a contention that any of the findings are "clearly erroneous."

The Bankruptcy Court concluded, *inter alia* (1) that the Company filed the reorganization petition in an attempt to break its union contracts; (2) that it has powers coextensive with the Board to adjudicate unfair labor practices and the Company is guilty of an unfair labor practice, "and

there is no need to hold long and expensive hearings before the [Board] because this Court can determine this from the evidence in this Case"; (3) that "the Company is too weak and infirm to sustain life from prolonged litigation", and "there are no funds or resources available for lawyers and litigation"; (4) that the Bankruptcy Court is empowered to reject union contracts and that it approved of the rejection of the union contracts with the Company; (5) that it is empowered to enjoin the administrative processes of the Board; and (6) that it is empowered to enjoin, and accordingly enjoined, former and present employees of the Company, as well as unions from interfering, in any way, with the operation of the Company's business and its normal flow of traffic.

This appeal followed.

## DISCUSSION

### The Bankruptcy Court And Adjudication Of Unfair Labor Practices

■ Section 10 of the National Labor Relations Act, 28 U.S.C. § 160, is entitled, "Prevention of unfair labor practices." Subsection (a) thereof provides, in relevant part:

> *Powers of Board generally.* The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice affecting commerce. *This power shall not be affected by any other means of adjustment or prevention that* has been or *may be established* by agreement, *law*, or otherwise.... (Emphasis added.)

Under the plain meaning of the statute, jurisdiction to determine the existence and prevent commission of unfair labor practices rests exclusively with the NLRB, sub-

---

4. The December 5, 1980 order of the Bankruptcy Court was not a preliminary injunction, for it was "issued without notice to the adverse party". FRCP 65(a)(1). It did not qualify as a temporary restraining order for there was no certification by the company's attorney of the efforts made, if any, to give notice and the reasons supporting his claim that notice should not be required. FRCP 65(b)(2). Company's

counsel represented to the Bankruptcy Court at the December 11 hearing that the Board has "... an attorney named Glenn Price who's headquarted in the City Federal Building. It's not as if this [i.e., Birmingham] isn't a place where they regularly do business". The record is absolutely silent as to the reason, if any, for which notice was not given to the Board.

ject to review by the various federal courts of appeals. In an early case construing § 10(a) of the NLRA, the Supreme Court stated:

> Congress declared that certain labor practices should be unfair, but it prescribed a particular method by which such practice should be ascertained and prevented. *By the express terms of the Act, the Board was made the exclusive agency for that purpose.*
>
>   \*    \*    \*    \*    \*    \*
>
> It is the Board, and the Board alone or its designated agent, which has the power to issue its complaint against the person charged with the unfair labor practice. If complaint is issued, there must be a hearing before the Board or a member thereof or its agent. The hearing is under the control of the Board. *The determination whether or not the person named in the complaint has engaged or is engaging in the unfair labor practice rests with the Board.*
>
> So far, it is apparent that *Congress has entrusted to the Board exclusively* the prosecution of the proceeding by its own complaint, the conduct of the hearing, *the adjudication* and the granting of appropriate relief.

*Amalgamated Workers v. Edison Co.*, 309 U.S. 261, 264–65, 60 S.Ct. 561, 563, 84 L.Ed. 738 (1940) (emphasis added). Subsequent cases have reaffirmed the Board's exclusive jurisdiction to prosecute and adjudicate unfair labor practice charges. *NLRB v. Phelps Dodge Corp.*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *Garner v. Teamsters Union*, 346 U.S. 485, 490, 491, 74 S.Ct. 161, 166, 98 L.Ed. 228 (1953); *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953).

■ The Board's exclusive jurisdiction to determine and remedy unfair labor practice charges in the context of bankruptcy pro-

ceedings was addressed by the Supreme Court in *Nathanson v. NLRB*, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952). There, the Court held that

> [i]t is the Board, not the referee in bankruptcy nor the court, that has been entrusted by Congress with authority to determine what measures will remedy the unfair labor practices. We think wise administration therefore demands that the bankruptcy court accommodate itself to the administrative process and refer to the Board the liquidation of the claim, giving the Board a reasonable time for its administrative determination.

*Id.*, at 30, 73 S.Ct. at 83. Thus, a trustee in bankruptcy who commits an unfair labor practice is "subject to the jurisdiction of the Board, notwithstanding the fact that he is an officer of the bankruptcy court, and the fact that the business of the bankrupt is being administered in a sense by the court." *Durand v. NLRB*, 296 F.Supp. 1049, 1055 (W.D.Ark.1969).

There is apparent agreement among the circuits which have considered the issue that bankruptcy courts lack jurisdiction to adjudicate and remedy unfair labor practices which affect commerce. *NLRB v. Baldwin Locomotive Works*, 128 F.2d 39 (3rd Cir. 1942); *In re Bel Air Chateau Hospital, Inc.*, 611 F.2d 1248 (9th Cir. 1979); *In re Shippers Interstate Service, Inc.*, 618 F.2d 9, 13 (7th Cir. 1980).

The Bankruptcy Court for the Northern District of Alabama opined that under the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 et seq., it has concurrent jurisdiction to hear, determine, and remedy unfair labor practices which affect commerce.[5] Given the historically settled exclusivity of NLRB jurisdiction to adjudicate and remedy unfair labor practice charges, unaffected "by any other means of adjustment or preven-

---

**5.** As that Court stated:

> Congress evidently intended to vest the Bankruptcy Court with the jurisdiction to enforce rights granted under the National Labor Relations Act and to share the same collaterally with the National Labor Relations Board and other administrative proceedings, even to the point of enjoining or excluding proceedings before such administrative court processes and to the exclusion, in the discretion of the Bankruptcy Court, of the normal administrative processes for the Board.
>
> (Conclusions of Law, paragraph 4).

tion that ... may be established by ... law," the Bankruptcy Court's opinion on this issue compels a close scrutiny of the specific provisions of the 1978 Bankruptcy Reform Act. For unless Congress, by a specific provision of the Judicial Code or the Bankruptcy Reform Act, conferred on the bankruptcy courts jurisdiction to adjudicate unfair labor practice charges affecting commerce, such jurisdiction does not exist.

In its scrutiny of the various provisions of the Bankruptcy Act, this Court has neither discovered, nor has its attention been directed to, any provision of the law which confers such jurisdiction on bankruptcy courts.

Section 1471 of the Judicial Code, a part of the Bankruptcy Reform Act, is the only provision arguably relevant to the issue. It provides, in pertinent part:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district court shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11. The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.

On its face, the provision is not applicable to NLRB proceedings, for the NLRB is not a "court," within the plain meaning of the statute.

The Congressional intent to treat court proceedings differently than regulatory proceedings under the 1978 Bankruptcy Code is perhaps best illustrated by § 362 thereof. Under subsection (a) of that section, the filing of a bankruptcy petition acts as an automatic stay of all court or judicial proceedings against the debtor; under sub-

section (b)(4) of § 362, such petition "does not operate as a stay ... of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." *NLRB v. Evans Plumbing Co.*, 639 F.2d 291, 293 (5th Cir. 1981). Thus, not only did Congress fail to confer jurisdiction on the Bankruptcy Court to hear and determine regulatory matters such as charges of unfair labor practice, it also exempted those proceedings from the automatic stay provisions of the Bankruptcy Reform Act.[6]

■ Moreover, as a part of the Bankruptcy Reform Act, Congress amended § 2(1) of the NLRA, 29 U.S.C. § 152(1), to include "trustees in cases under title 11 of the United States Code" as persons subject to the provisions of the nation's labor laws. Prior to the amendment, trustees in bankruptcy were covered by the law. By enacting the amendment, Congress evinced an intention to eradicate any doubt as to whether that coverage survived the Bankruptcy Reform Act. Thus, bankruptcy proceedings do not relieve a person of his obligation to refrain from engaging in unfair labor practices.

■ Further, § 1478 of the Judicial Code, enacted as a part of the Bankruptcy Reform Act, reflects a Congressional intention to preclude the bankruptcy courts from usurping the role of regulatory agencies. The section[7] generally permits removal of "any claim or cause of action in a civil action" to the appropriate bankruptcy court. There are only two statutory exceptions to this rather broad removal power or jurisdiction; and one of these is "... a civil action by a Government unit to enforce such governmental unit's police or regulatory power...."

A party may remove any claim or cause of action in a civil action, other than ... a civil action by a Government unit to enforce such governmental unit's police or regulatory power, to the bankruptcy court for the district where such civil action is pending, if the bankruptcy courts have jurisdiction over such claim or cause of action.

---

**6.** The House Judiciary Report accompanying the 1978 Bankruptcy Reform Act describes the automatic stay as "one of the fundamental debtor protections provided by the bankruptcy laws."

**7.** Section 1478 provides, in relevant part, that

Neither section 1471 of the Judicial Code nor any other statute vests concurrent jurisdiction in the bankruptcy courts to adjudicate and remedy unfair labor practices.[8] The Bankruptcy Court is due to be reversed on this issue.[9]

## The Norris-LaGuardia Act And The Bankruptcy Court's Power To Enjoin Activities Arising Out Of Labor Disputes

With no apparent consideration of possible jurisdictional impediments, the Bankruptcy Court enjoined the parties, as well as persons not before the court (past and present employees), from interfering "in any way" with the operations of Brada Miller "and its normal flow of traffic," except by petition or complaint filed in the Bankruptcy Court.

Because of widespread abuse by federal courts of injunctive relief in labor-management controversies, Congress in 1932 enacted the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. The Act embodies a national public policy in favor of the individual worker's freedom to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection," among other things; and to that end, it drastically restricted the jurisdiction of "the courts of the United States." Id., § 102.

The Norris-LaGuardia Act provides generally that

No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this Act.

Id., § 101. Under § 4 of the Act, "no court of the United States" may enjoin "any person or persons participating or interested in" a labor dispute

from doing . . . any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

\* \* \* \* \* \*

(e) Giving publicity to the existence of, or facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified. . . .

That the bankruptcy court has historically been held to be such a "court of the United States" subject to the provisions of the Norris-LaGuardia Act is clear beyond question. *Truck Drivers Local Union No. 807 v. Bohack Corp.*, 541 F.2d 312, 318 (2nd Cir. 1975); *In re Third Avenue Transit Corp.*, 192 F.2d 971, 973 (2nd Cir. 1951); *International Brotherhood of Teamsters v. Quick Charge Inc.*, 168 F.2d 513, 515–16 (10th Cir. 1948). It is equally certain that the broad injunction issued by the Bankruptcy Court both contravenes the public policy undergirding the Norris-LaGuardia Act, as well as its specific provisions outlined above, for the injunction prohibits concerted activities such as peaceful picketing and nonviolent strikes.

As the Second Circuit stated in *Truck Drivers Local Union No. 807 v. Bohack Corp., supra*, 541 F.2d at 318:

---

8. In arriving at this conclusion, the Court is not unmindful of *In Re Unit Parts*, 9 B.R. 386 (W.D. Okl.1981), which reaches the opposite conclusion in a different factual setting where the bankruptcy court did *not* enjoin NLRB proceedings. This Court respectfully disagrees with the rationale of that decision.

9. All of the parties to this appeal are in agreement that the bankruptcy court lacked jurisdiction to adjudicate the unfair labor practice charges against Brada Miller.

The argument is made that to allow picketing in the case of the financially troubled debtor is to put it out of business. This is unfortunately sometimes the sad outcome when a union and employer cannot come to terms. But the policy of our labor laws is simply to provide rules for the handling of labor disputes, not to prohibit the use of economic powers in the resolution of such disputes. By filing under Chapter 11 an employer does not become clothed in immunity from union action.

...[T]he debtor in a bankruptcy proceeding has other means for release from unlivable conditions in a collective bargaining agreement by petitioning for permission to reject the contract. But the power to permit rejection of the agreement in particular circumstances does not confer an antecedent jurisdiction on the court to enjoin picketing in spite of the Norris-LaGuardia Act.

Nothing in the Bankruptcy Reform Act expressly or impliedly repeals Norris-LaGuardia in the context of bankruptcy proceedings; and Brada Miller has not cited on appeal any authority for the jurisdiction of bankruptcy courts to enjoin concerted activities arising out of labor disputes.

Brada Miller argues that the Bankruptcy Court properly accommodated the policies behind the Norris-LaGuardia Act to those underlying the Bankruptcy Reform Act. It cites, as precedent for such accommodation, the landmark case of *Boys Market v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In *Boys Market*, the Supreme Court held that notwithstanding Norris-LaGuardia, a federal district court may, in appropriate cases, enjoin a strike in violation of a no-strike clause in a collective bargaining agreement which provides for the arbitration of labor disputes. However, the Court carefully pointed out that

**10.** This appeal does not raise the issue of bankruptcy court jurisdiction to issue a *Boys Market* type injunction.

**11.** The Court's injunction, insofar as it bars nonviolent picketing, also conflicts with section 7 of the NLRA, 29 U.S.C. § 157, which protects

...the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration.

*Id.,* at 252–53, 90 S.Ct. at 1593. At yet another point in *Boys Market,* the Court reiterated: "Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act." *Id.,* at 253, 90 S.Ct. at 1594.

In stark contrast to the considerations present in *Boys Market,* the issuance of an injunction by the Bankruptcy Court under the facts of this case effectively eviscerates the central purpose of and the public policy embodied in Norris-LaGuardia.[10]

■ The Bankruptcy Court exceeded its authority and disregarded the unequivocal command of Norris-LaGuardia,[11] and its injunction barring conduct and concerted activities arising out of a dispute between Brada Miller and its employees must be dissolved.

### The Bankruptcy Court's Discretionary Stay Of NLRB Proceedings

■ The bankruptcy court's grant of power to issue discretionary stays emanates from § 105 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 105(a) which provides that "[t]he bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title...." Section 105(a) is based on, and does not substantially differ from § 2(a)(15) of the previous Bankruptcy Act, 11 U.S.C. § 11(a)(15). Section 2(a)(15) empowered the bankruptcy courts to "[m]ake such orders, issue such process, and

peaceful labor picketing and other concerted activities. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959); *Youngdahl v. Rainfair,* 355 U.S. 131, 139, 78 S.Ct. 206, 211, 2 L.Ed.2d 151 (1957).

enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this Act...."

The bankruptcy court's power to issue a discretionary stay of NLRB proceedings derives from the plain meaning of the statute. *See In re Bel Air Chateau Hospital, Inc., supra,* 611 F.2d 1248. Neither the Fifth Circuit nor the Eleventh Circuit has rendered an opinion on the question. In holding that the automatic stay provision of 11 U.S.C. § 362 does not apply to NLRB enforcement proceedings for injunctive relief and backpay, the court expressly pretermitted consideration of the question of whether the bankruptcy court is empowered to issue discretionary stays of such proceedings under § 105(a). *NLRB v. Evans Plumbing Co.,* 639 F.2d 291, n. 3 (5th Cir. 1981), citing *Bel Air, supra,* and *In re King Memorial Hospital, Inc.,* 4 B.R. 704 (Bkrtcy. S.D.Fla.1980).

In the *King Memorial Hospital* case, the bankruptcy court reviewed the legislative history of § 105 and concluded that it gives the bankruptcy court the power to stay proceedings which are otherwise excepted from the automatic stay provision of § 362(a) by § 362(b)(4), *i.e.,* proceedings commenced or continued by a governmental regulatory unit such as the NLRB. Quoting the Senate and House reports on § 362(b)(4), the court stated that "[s]tays or injunctions [under § 105] ... will not be automatic upon the commencement of a case, but will be granted or issued under the usual rules for the issuance of injunctions...."

The Fifth Circuit's citation of *Bel Air* and *King Memorial Hospital,* even as it refrained from expressing an opinion on a question that was not before it, lends some support to this Court's conclusion that bankruptcy courts have power to issue discretionary stays where appropriate. Another more substantial indicator of the Fifth Circuit's recognition of the discretionary staying power of the bankruptcy courts under § 105(a) is found in *Securities and Exchange Commission v. First Financial Group of Texas,* 645 F.2d 429 (5th Cir. 1981). One of the questions presented on that appeal was whether the district court had jurisdiction to appoint a receiver for the dealer pursuant to an action by the SEC where bankruptcy proceedings had been instituted against the dealer. In affirming the district court's jurisdiction to do so, the Court of Appeals stated that "[t]o the extent that the exercise of this jurisdiction threatens the assets of the debtor's estate, the bankruptcy court *may* issue a stay of those proceedings." *Id.* at 440 (emphasis added). Thus, this Court concludes that the bankruptcy court had authority to issue a discretionary stay of the NLRB's unfair labor practice proceedings against the appellee, Brada Miller.

Having determined that the bankruptcy court may, in appropriate circumstances, exercise its discretion to stay NLRB proceedings, the Court now turns to the question of whether the bankruptcy court abused its discretion in the case at bar.

■ Although the Eleventh and former Fifth Circuit Courts of Appeal have not articulated a precise standard determining an "abuse of discretion" in cases involving stays under § 105, the prevailing standard in cases of attorneys' fees in bankruptcy proceedings seems analogously apposite. Adapting that standard to this case, the bankruptcy judge abuses his discretion when he fails to apply the proper legal standard, fails to follow proper procedure or bases his decision upon findings of fact that are clearly erroneous. *Cf. Matter of U. S. Golf Corporation,* 639 F.2d 1197 (5th Cir. 1981).

It is clear from the findings of fact and conclusions of law entered by the bankruptcy court that the bankruptcy judge failed to apply the proper legal standard and to make the findings necessary to validate his legal conclusions. More specifically, the bankruptcy court did not make a finding that the regulatory proceedings of the NLRB threatened the assets of Brada Miller's estate before entering a stay of those proceedings.

The "threat to the estate's assets" test was enuniciated in *In re Bel Air Chateau Hospital, supra,* 611 F.2d 1248. The Court stated that "[i]f regulatory proceedings threaten the assets of the estate, the decision to issue a stay can then be made on a discretionary basis." *Id.,* at 1251. The *Bel Air* case was decided under the old Bankruptcy Code.

Another Court of Appeals decision on the issue is that of *In re Shippers Interstate Service, Inc.,* 618 F.2d 9 (7th Cir. 1980), which reiterated the "threat to the estate's assets" test while citing *Bel Air.* However, this case, too, was decided under the old Bankruptcy Code. Therefore, the Court must determine whether the "threat to the estate's assets" test is still viable under the new Bankruptcy Code.

Section 105(a) and its predecessor, section 2(a)(15), do not differ much in their wording. Yet, the argument might be made that § 105(a) is much broader than its predecessor due to the expanded power and jurisdiction given the bankruptcy courts under 28 U.S.C. § 1471. 2 *Collier on Bankruptcy* (15th ed., 1981) paragraph 105.01, at p. 105–1. Although the jurisdiction of the bankruptcy court was expanded by § 1471(b), it does not necessarily follow that the applicable principles governing the issuance of a discretionary stay of administrative proceedings under § 105(a) were simultaneously relaxed. The language of § 105(a) conveys Congress' intent "to enable the bankruptcy court to do whatever is necessary to aid its jurisdiction...." *Id.* paragraph 105.02 at p. 105–4. But it does not convey an intent to grant power without bounds.

In *In re Seeburg Corporation,* 11 B.R. 121 (Bkrtcy.N.D.Ill.1980), the district court followed the "threat to the estate's assets" test, citing *In re Shippers* as precedent. The district court held that the bankruptcy judge should not have stayed the unfair labor practice proceeding brought by the NLRB since the estate's assets were not threatened.

A Fifth Circuit decision which adopts the "threat to the estate's assets" test is *Securities and Exchange Commission v. First Financial Group of Texas, supra,* 645 F.2d 429. *See* p. 1012 *supra.* That case upheld the jurisdiction of the district court to appoint a receiver.[12] The Fifth Circuit reasoned that if the district court's exercise of jurisdiction threatened the assets of the debtor's estate, the bankruptcy court might issue a stay of those proceedings. Similar reasoning applies to the case at bar. The NLRB had jurisdiction to hear unfair labor practice charges against Brada Miller. If the NLRB's exercise of its jurisdiction threatened the assets of the debtor's estate, the bankruptcy court might issue a stay of the proceedings.

A finding that the debtor's assets are threatened is a prerequisite to a stay of the NLRB's proceedings. The bankruptcy court did not make the necessary finding. It quoted an excerpt from *In re Shippers, supra,* 1, stated the appropriate test, but then failed to apply that test. Accordingly, the bankruptcy court abused its discretion by staying the NLRB proceedings without finding that those proceedings threatened the assets of Brada Miller; the stay must be dissolved.

### Rejection Of The Collective Bargaining Agreements

Section 365(a) of the Bankruptcy Reform Act authorizes a bankruptcy trustee, subject to court approval, to "reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Here, the Bankruptcy Court approved the rejection of Brada Miller's collective bargaining agreements with various Teamster locals—over the objections of the affected unions.[13]

---

12. 11 U.S.C. § 105(b) provides that "a bankruptcy court may not appoint a receiver in a case under this title...."

13. This Court is unimpressed by the union's contention that collective bargaining agreements are not executory contracts which may be rejected under § 365.

In addition to the consideration that the courts have held to the contrary, Congress, by exempting from § 365 collective bargaining agreements subject to the Railway Labor Act, obviously intended that all other kinds of collective bargaining agreements be covered by § 365. 11 U.S.C. § 1167.

■ · To begin with, this Court's review of the Bankruptcy Court's findings of subsidiary facts in support of its approval of the rejection is governed by the "clearly erroneous" rule. *Collier on Bankruptcy, supra*, paragraph 30.03, at p. 3–315. Further, the legal standard for determining the propriety of contract rejection is two-pronged: (1) the court must find that the collective bargaining agreements are "onerous and burdensome," and (2) the court must find that the equities, when carefully weighed in light of the principles embodied in the NLRA "tip decidedly" in favor of the debtor and against its employees. *Brotherhood of Railway, Airline, and Steamship Clerks v. R.E.A. Express Inc.*, 523 F.2d 164, 166 (2d Cir. 1975), *cert. denied*, 423 U.S. 1017, 1073, 96 S.Ct. 451, 855, 46 L.Ed.2d 388, 47 L.Ed.2d 82 (1975); *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698 (2d Cir. 1975).

■ The first prong of the test is satisfied only by showing that "unless the agreement is rejected, the [employer] will collapse and the employees will no longer have their jobs." *Id.*, 523 F.2d at 172. An examination of the record reveals substantial evidence that in the absence of rejection of the collective bargaining agreements, Brada Miller would have been unable to "break even" and therefore would have been forced out of business. The Bankruptcy Court's findings in this regard, while inartfully phrased are not "clearly erroneous."

The Bankruptcy Court was apparently aware of its obligation to weigh the equities, and accordingly, it analyzed the employee benefits under the collective bargaining agreements—which, for the most part, would be lost or substantially reduced in the event Court approval of the rejection of the agreements. Although the employees would be subjected to substantially re-

duced benefits by approval of rejection of the collective bargaining agreements, they would be subjected to a far greater harm (*i.e.*, loss of employment) should the rejection be disallowed, for Brada Miller would surely collapse under the weight of the collective bargaining agreements. The Bankruptcy Court was ever-mindful of the principles favoring collective bargaining embodied in the NLRA, as reflected in its findings and conclusions. Again, upon consideration of the record as a whole, this Court concludes that the weighing of the equities involved in the rejection *vel non* of the collective bargaining agreements is not "clearly erroneous."

The Bankruptcy Court's rejection of the collective bargaining agreements will accordingly be affirmed.

## CONCLUSIONS

For the reasons set forth above, the decision appealed from is: (a) REVERSED, insofar as the Bankruptcy Court assumed jurisdiction to adjudicate unfair labor practice charges against Brada Miller; (b) REVERSED, and the injunction DISSOLVED, insofar as the said court enjoined conduct and concerted activities by employees and unions in contravention of the Norris-LaGuardia Act; (c) VACATED, insofar as it stayed NLRB proceedings against Brada Miller; and (d) AFFIRMED, insofar as it approved the rejection of the collective bargaining agreements between the various Teamster locals and Brada Miller.

---

The Court is similarly unimpressed with the union's argument that they were denied their due process rights to notice and a hearing prior to court approval of the rejection of their collective bargaining agreements with Brada Miller. That Court's initial error in approving the rejections without notice and hearing was cured by its cancellation of the original approval and setting the issue down for a hearing on the requests of the unions. The unions were permitted to participate in the hearing.