In re PROFESSIONAL SALES CORPO-
RATION, d/b/a Professional Construc-
tion Company, and Illinois Crane and
Erection Company, Debtors.

PROFESSIONAL SALES
CORPORATION,
Plaintiffs,

v.

UNITED STATES of America, et
al., Defendants.

Bankruptcy No. 82 B 6226.
Adv. No. 84 A 549.

United States Bankruptcy Court,
N.D. Illinois, E.D.

April 26, 1985.

John H. Redfield, Chicago, Ill., Trustee.

Elizabeth Stein, Asst. U.S. Atty., Chicago, Ill., for defendants.

MEMORANDUM OPINION

FREDERICK J. HERTZ, Bankruptcy Judge.

This case comes to be heard on the motion of Professional Sales Corporation ("PSC") to reinstate a temporary restraining order ("TRO") previously issued by this court against the Environmental Protection Agency of the United States ("EPA"). P.S.C. also requests that this court set a hearing date to consider its motion for a preliminary injunction. The EPA has made a motion to dismiss and to strike the hearing date.[1] The threshold question is whether this court has the requisite subject matter jurisdiction to grant PSC's motion. The EPA contends that the court does not have jurisdiction because of the doctrine of sovereign immunity, and on other grounds. Because this court finds that it does possess the necessary jurisdiction, it must next determine whether a temporary restraining order should be entered and a hearing date set.

II.

PSC is in the business of constructing and maintaining industrial and commercial buildings. On January 18, 1983, after protracted litigation, PSC acquired title to a piece of property located at 2200 East 119th Street, Chicago, Illinois, pursuant to a mechanic's lien foreclosure suit. *Professional Construction Co. et al. v. Harris Trust & Savings,* 77 CH 8552. At the time PSC acquired title, the property was being operated as a hazardous waste site by Cal Harbor Development Corporation and Alburn, Inc., ("Cal Harbor") the judgment debtors, pursuant to an interim status authorization permitted by the EPA.[2]

PSC has never operated the site for hazardous waste disposal. However, before PSC acquired the property, the Cal Harbor management had a history of violating EPA standards.[3] PSC inherited these problems. In addition, Cal Harbor had never completed its application to the EPA in order to convert its interim status into a

1. When the present motions were taken under advisement, the court adjourned, with respect to this case, *sine die.* Accordingly, the EPA's motion to strike the hearing date is moot, and will consequently not be addressed herein.

2. Subtitle C of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended 42 U.S.C. § 6901 *et seq.,* designates the EPA to establish a comprehensive federal management system for hazardous waste. Pursuant to this designation, the EPA has set technical, administrative and monitoring standards to control the operation of waste management facilities. *See e.g.* 45 *Fed. Reg.* 33066 *et seq.;* 40 C.F.R. Parts 261–265 and 270, 271 and 124. If these standards are met, the EPA will issue a permit authorizing hazardous waste facilities to operate. Section 3005, 42 U.S.C. § 6925.

When Congress enacted Subtitle C of the Solid Waste Disposal Act, effective November 19, 1980, it was cognizant that the then-operating hazardous waste facilities would need authorization to continue operations until the EPA had an opportunity to review their applications. Congress therefore provided that facilities which: 1) were in existence on November 19, 1980; 2) had properly given notice of hazardous waste activity; and 3) filed a conforming application for a permit with the EPA, would be given "interim status." If a facility enjoyed "interim status," it would be treated as if it had been issued a permit until the EPA approved or rejected the application.

3. On December 5, 1981, the EPA noted several violations of its standards. On July 2, 1982, certain wastes at the site ignited, causing further consternation on the part of the EPA.

On November 22, 1982, the EPA conducted an inspection and noted that the condition of the site still had not conformed with EPA standards and presented potential fire, explosion and safety hazards.

semi-permanent permit.[4] PSC, therefore, also inherited this obligation.

In February of 1983, shortly after PSC acquired title, it caused the interim status permit of the site to be transferred from Cal Harbor to PSC. Representatives of PSC also began discussions with the EPA regarding the granting of an extension in the time which PSC had to complete the application and to clean up the site so that it would comport with EPA standards. Extensions were granted by the EPA, but before PSC complied with the EPA requirements, it filed for relief under Chapter 11 of the Bankruptcy Code on May 18, 1983.

Although the EPA and PSC continued their communications after the filing, PSC was unable to conduct the clean-up or complete the permit application due to its ailing financial condition. Further complications arose when two drums on the site exploded on July 5, 1983, thereby demonstrating the potential dangerousness of the site. In view of this explosion, the results of previous inspections, and PSC's apparent financial inability to rectify the situation, the EPA conducted a superfund removal of hazardous wastes at the site. The removal lasted from approximately July 8, 1983 to October 31, 1983, and involved substantial expenditures of manpower and money. The superfund clean-up also entailed destruction of approximately two million dollars worth of incineration equipment and real estate improvements owned by PSC.

As a result of this superfund clean-up, the property is in a substantially safer condition. Though some toxic wastes remain, the site is in a benign state. Since PSC is not conducting operations on the property, there is little threat of recurrence of the sort of dangers which previously plagued the site. The fact that the site is located in a heavily industrialized part of the city, and is totally surrounded by land fill and dumping grounds, further insures its present safety.

In September of 1983, the EPA gave PSC notice of its tenative decision to terminate the site's interim status, because PSC had failed to timely submit "Part B" of its permit application, and on other grounds. The EPA also gave public notice of its intent to terminate. On January 4, 1984, the EPA held a public hearing regarding its intent to terminate the interim status of the site which PSC owns. On April 12, 1984, the EPA made a final decision to terminate.

On May 10, 1984 PSC brought the present adversary action against the EPA, seeking to enjoin the EPA from revoking PSC's interim status on the basis that the EPA's proposed action would substantially and adversely affect the value of the largest asset of the estate. The EPA contested the action primarily by attacking this court's jurisdiction. Because this court believed that PSC had demonstrated proper grounds for the issuance of a TRO, and that the EPA's jurisdictional attacks were not meritorious in this context, this court granted PSC the relief prayed for. Furthermore, this court gave several extensions of the TRO to preserve the status quo pending decision on the merits.

The EPA filed two appeals of this court's orders granting TROs. *United States v. Professional Sale Corporations,* Nos. 84 C 6079 and 84 C 6551 (U.S.D.C.N.D.IL.E.D.). During the pendency of these appeals, the last extension of the TRO granted by this court lapsed. The district court, the Honorable Susan Getzendanner presiding, therefore dismissed the appeal as being moot. The dismissal was not without comment, however. Judge Getzendanner, in an opinion dated November 2, 1984, stated

4. The permit application required by the EPA is divided into "Part A" and "Part B." Part A must contain certain minimal descriptive information, be signed by the owner of the facility, and be filed under certain time constraints. 40 C.F.R. §§ 270.10 and 270.13. Part B contains detailed technical information and must be submitted within 6 months after the EPA requests it. 40 C.F.R. §§ 270 and 124. The EPA may grant extensions of the six month filing requirement.

Cal Harbor had filed Part A, but not Part B. On February 17, 1983, PSC filed its own Part A application. As yet, no Part B has been filed by either Cal Harbor or PSC.

that in the event that this court is again faced with a motion by PSC for a restraining order, the court must address the issue of its own jurisdiction before granting further relief. Since PSC on November 13, 1984, made a motion to "reinstate TRO," and for the setting of a hearing date, this court will address the subject of its jurisdiction, as well as other issues presented by the motion, forthwith.

III.

This adversary action was filed in May of 1984. PSC originally stated that this court had jurisdiction under Title 28, Section 1471 of the United States Code. It may be noted that this was prior to the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("'84 Act"). The '84 Act supplanted the jurisdiction granted by § 1471 with jurisdiction granted in 28 U.S.C. § 1334(a), (b) and (d) in the hopes of rectifying the constitutional infirmities contained in the prior statutory scheme. *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Section 157(b)(1)–(2) of Title 28 delineates the bankruptcy court's jurisdiction in terms of "core" and "non-core" proceedings.

Since the law controlling jurisdiction has been substantially amended during the pendency of this case, this court feels compelled to clarify the basis of jurisdiction which is controlling in the present action. Section 122 of the '84 Act provided that the new jurisdictional language would be controlling in all actions pending at the time of enactment.[5] Therefore, the present action is controlled by the language of the '84 Act, and not by 28 U.S.C. § 1471. PSC's motion to enjoin the EPA is a core proceeding, as that term is defined in 28 U.S.C. § 157(b)(2)(0):

> (b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
>
> (2) Core proceedings include, but are not limited to—
>
> (0) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

The present action will "[affect] the liquidation of the assets of the estate" in that the PSC property with the designation of interim status can presumably be sold for substantially more money than it could be sold for without the designation of interim status.

A. Jurisdiction

A more problematic issue presented by this case is whether this court has subject matter jurisdiction in light of the EPA's assertion of sovereign immunity. It is beyond question that a federal court has the ability to determine its own jurisdiction. Bankruptcy courts, likewise, possess this ability. *In re Dartmouth House Nursing Home, Inc.*, 30 B.R. 56 (B.A.P. 1st Cir. 1983).

The EPA correctly points out that, generally, the United States may only be sued to the extent that it has waived its sovereign immunity, *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981); that waivers of immunity are to be strictly construed, *Block v. North Dakota*, 461 U.S. 273, 103 S.Ct. 1811, 1816, 25 L.Ed.2d 840 (1983); and that consent to be sued may not be inferred from a statute that omits all references to the sovereign, *Danning v. United States*, 259 F.2d 305, 309 (9th Cir.1958). The EPA maintains that the doctrine of sovereign immunity bars the present action "unless plaintiff can point to some provision of the Bankruptcy Code itself that operates as a

5. There were two exceptions to this retroactive application: 1) Section 1334(c)(2) relating to mandatory abstention; and 2) Section 1411(a) relating to the right to a jury trial, were both to have prospective application only. *See generally* 1 Collier on Bankruptcy par. 3.01 (15th Ed.).

waiver of sovereign immunity and empowers this court to enjoin EPA[s] ..." Defendants' Memorandum of Law at p. 14, incorporated by Adversary Defendants' Memorandum Opposition [sic] to Motion to Reinstate TRO at p. 3.

That provision is contained in 11 U.S.C. § 106, which provides:

> (a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.
>
> (b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.
>
> (c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—
>
> (1) a provision of this title that contains "creditor", "entity", or "governmental unit" applies to governmental units; and
>
> (2) a determination by the court of an issue arising under such a provision binds governmental units.

As the EPA correctly points out, § 106(a) and (b) are inapplicable in this case in light of the fact that the EPA is making no claim against PSC and § 106(a) and (b) are only triggered when there is a counterclaim against the sovereign. However, the EPA ignores the effect of § 106(c). In *Neavear v. Schweiker,* 674 F.2d 1201 (1982), the Seventh Circuit reversed the lower courts' holding that the § 106 waiver was not invoked because the sovereign had not brought a claim against the debtor. The *Neavear* court stated that Section 106(c), "unlike sections 106(a) and (b) does not condition waiver of sovereign immunity upon the filing of a proof of claim." 674 F.2d at 1204. To deny 106(c) such application would be to read it out of the statute. *See In Re Remke, Inc.,* 5 B.R. 299, 2 C.B. C.2d 670 (Bankr.E.D.Mich.1980).

While glossing over this important point, the EPA notes that if this court is to grant injunctive relief against the EPA, it would have to rely on the powers granted it by 11 U.S.C. § 105.[6] The EPA in turn reasons that since § 105 does not use the term "creditor," "entity" or "governmental unit," the § 106 waiver is not triggered. *Cf. Gardner v. Commonwealth of Pennsylvania,* 685 F.2d 106 (3rd Cir.1982) (the court calls the use of the same argument in a § 522(f) case "ingenious but unpersuasive"). The EPA applies the language of § 106 far too liberally. As a matter of statutory construction, if the legislative intent is clear, the court is obligated to give effect to that intent. *Herren v. Farm Sec. Adm.,* 153 F.2d 76 (8th Cir.1946). Congress' intent is eminently clear, as illustrated by the following:

> With respect to stays issued under other powers [§ 105] *or* the application of the automatic stay, to governmental actions, this section [§ 106] and the other sections mentioned are intended to be an *express waiver* of sovereign immunity of the Federal government ...

House Report at 342, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6298–6299 (emphasis added). The EPA's citation of legislative history to the contrary has been overruled. *See* 124 Cong.Rec. H 11,901 (Sept. 28, 1978); S 17407 (Oct. 6, 1978); *cf.* 124 Cong.Rec. 11,097 (Sept. 28, 1978); S17,-414 (Oct. 6, 1978).

While it is true that § 105 does not use the terms "creditor," "entity" or "governmental unit," it does state that the

6. Although the proposition is by no means clear, PSC has 'conceded' the 11 U.S.C. § 362 automatic stay provision does not apply to the present case. *Compare Island Club Marina, Ltd. v. Lee County,* 32 B.R. 331 (Bankr.N.D.Ill.1983) (362(b)(4) is to be given a narrow construction) *with In the Matter of Canarico Quarries Co.,* 466 F.Supp. 1333 (D.P.R.1979) (government regulatory action not stayed by § 362). In the view of PSC, § 362(b)(4) excepts this case from operation of the stay. Since this court finds that § 105 imbues it with ample power to grant injunctive relief, *see* pp. 658–659 *infra,* the court will not address the § 362 issue at this time.

bankruptcy court has equitable powers to issue any order which it deems necessary or appropriate to "carry out the provisions of this title [title 11]." 11 U.S.C. § 105. Section 105 thereby embraces all other sections of the title in its operation; most of which will contain the "operative" terms. Section 105 does not include any of the operative terms because it is a general declaration of power. While it is true that § 105 does not grant the court jurisdiction which it does not already possess, *Hall v. Jet Television Rental, Inc.,* 30 B.R. 799, 801 n. 3 (M.D.Tenn.1983); it does ensure that the court will be authorized to use the whole range of its inherent, equitable powers. The bankruptcy court undeniably has the power to protect the assets of the estate,[7] and § 105 aids the court in bringing this power to effect. To deny the effect of § 105 simply because the general statement of power therein does not use certain "operative" terms would both thwart the intent of Congress as well as inhibit the equitable powers which the bankruptcy court is obliged to exercise. The adoption by Congress of broad statutory language in authorizing suits against the United States is not to be thwarted by an unduly restrictive interpretation. *Canadian Aviator v. U.S.,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 90 (1945).

Furthermore, even if § 106 is interpreted narrowly so as to preclude it is a waiver of sovereign immunity under § 105, the court could grant injunctive, as distinguished from affirmative, relief against the sovereign pursuant to its inherent equitable powers. Section 105 is not intended to limit the bankruptcy court's inherent authority. *In Re Coram Graphic Arts,* 11 B.R. 641, 644 (Bankr.E.D.N.Y. 1981). "It would not appear that the rules governing waiver of sovereign immunity in section 106 are solely controlling in regard to the issue of the power of a bankruptcy court to provide injunctive relief against a governmental unit. Such entities, prior to the enactment of [§ 106], were held subject to the injunctive power of the bankruptcy court, not on the basis of any theory of waiver, but under general, equitable principles." 2 Collier's on Bankruptcy par. 106.-01 at 106–3 (15th Ed.) (citations omitted). A number of cases have acknowledged that federal and state administrative regulatory actions may be enjoined on a discretionary basis. *Missouri v. U.S. Bankruptcy Court,* 647 F.2d 768, 776–77 (8th Cir.1981), *cert. den.* 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982); *Garrity v. Goldstein (In Re National Hospital and Institutional Builders Company),* 658 F.2d 39, 43 (7th Cir.1980) (dicta); *National Labor Relations Board v. Jones, (In Re Bel Air Chateau Hospital, Inc.),* 611 F.2d 1248, 1251 (9th Cir.1979) (per curiam); *National Labor Relations Board v. Brada Miller Freight Systems, Inc.,* 16 B.R. 1002, 6 C.B. C.2d 375, 388–89 (N.D.Ala.1981); *In Re Northern Boneless Meat Corp.,* 9 B.R. 27, 29 (D.C.S.C.N.Y.1981); *Tucson Yellow Cab Company v. National Labor Relations Board,* 27 B.R. 621, 628 (B.A.P. 9th Cir. 1983); *Schatzman v. Department of Health and Rehabilitative Services, (In Re King Memorial Hospital, Inc.),* 4 B.R. 704, 709 (Bankr.S.D.Fla.1980); *Hudtwalker v. United States Department of Energy,* 25 B.R. 471 (Bankr.E.D.N.Y.1982); *In Re Jon Company, Inc.,* 30 B.R. 831, 834–35 (D. Col.1983); *Jordan v. Randolph Mills, Inc.,* 29 B.R. 398 (D.C.1983).

This court can point to one other basis for granting relief in this case contrary to the EPA's claim of sovereign immunity. The doctrine of sovereign immunity is based on the fiction that "the king can do no wrong." *Lansing v. County of McLean,* 359 N.E.2d 165, 167, 45 Ill.App.3d 91, 3 Ill.Dec. 755 (1976). As a practical matter, the doctrine serves to ensure that no money shall be expended out of the public coffers without the consent of the sovereign. It is a doctrine of judicial origin, and is widely disfavored as being outmoded. *See e.g. Lansing, supra, Union Trust Co. of District of Columbia v. U.S.,* 113

7. The issue of whether the "interim status" at issue in this case is property of the estate, as that term is defined in 11 U.S.C. § 541, will be discussed at pp. 658–659, *infra.*

F.Supp. 80 (D.D.C.1953) *aff'd. in part, mod. in part* 221 F.2d 62, *cert. den.* 350 U.S. 911, 76 S.Ct. 192, 100 L.Ed. 799, *aff'd.* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 *Nat'l City Bank of N.Y. v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1956); *reh. den.* 349 U.S. 913, 75 S.Ct. 598, 99 L.Ed. 1247. Consequently, cases have held that where the proposed relief would not involve ordering the government to expend any funds, such relief may be granted without violating the doctrine of sovereign immunity. *See Grumman Ecosystems Corp. v. Gainesville-Alachua Co. Reg. Electric, Water, and Sewer Facilities Bd.,* 402 F.Supp. 582, 586 (N.D.Fla.1975) (granting injunctive relief against the EPA).

By enjoining the EPA from terminating PSC's interim status for a limited period of time, this court will not be requiring the EPA to spend any federal funds. Furthermore, it must be stressed that this court is not attempting to enjoin the EPA from protecting the public health by closing a dangerous site. Here, any danger has been alleviated. The property has already been detoxified by the superfund clean-up, and is, therefore, presently in a benign and dormant state. PSC never operated the property as a hazardous waste site and does not intend to do so. There is no threat that the EPA will have to expend further funds for clean-ups or for any other reason. The proposed injunction would simply keep the site's interim status in place pending conclusion of the negotiations between PSC and the proposed purchaser of the site.[8] Injunctions granted in bankruptcy under § 105 are a proper means of maintaining the status quo until the court can make a final ruling. 2 Collier's Bankruptcy Practise Guide, par. 39.-03[16].

To summarize, this court finds that the EPA's assertion of sovereign immunity does not preclude this court from granting limited injunctive relief against it. Section 106 of Title 11 and various legislative comments to Title 11 indicate that sovereign immunity is largely waived in the bankruptcy context. Furthermore, even if § 106 is not interpreted as a waiver under these facts, the bankruptcy court has the power to enjoin the government, without reference to § 106, under its inherent, equitable powers. And, finally, courts which recognize the doctrine of sovereign immunity as disfavored and largely outmoded, look to the purposes of the doctrine and limit its application to cases where those purposes may be served. This is not such a case.[9]

8. Further details regarding the proposed purchaser and the injunctive relief granted will be discussed at p. 660, *infra.*

9. The EPA also objects to this court's jurisdiction on the basis that: 1) the case is not ripe for judicial review because it does not meet the "case or controversy" requirement of Article III of the Constitution; and 2) PSC has not exhausted its administrative remedies prior to seeking relief from this court. This court does not believe either of these bases are repugnant to its exercise of jurisdiction in this case. The Supreme Court has addressed these issues in the case of *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and set out principles to guide the courts in this context. The *Abbott* court stated that the rationale of the ripeness doctrine arises out of the courts' reluctance to apply injunctive remedies unless administrative decisions arise in a context which is ripe for judicial resolution. The Court pointed out that the ripeness doctrine insured that the courts would not entangle themselves in *abstract* disagreements over administrative policies. The Court went on to clarify that the doctrine would prevent a court from intervening until an administrative decision was formalized and its effects felt in a concrete way. The *Abbott* Court held that courts faced with this issue must consider both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. 387 U.S. at 149, 87 S.Ct. at 1515.

The decision to terminate PSC's interim status has been made. This interim status is the most valuable potential asset of the estate. PSC has a buyer willing to spend from 2.5–3 million dollars on the site which PSC owns, but only if the interim status remains in place. *See* letter attached as Appendix A, hereto. This is hardly an abstract conflict. The issue is fit for judicial resolution. Furthermore, the hardship to the estate of PSC will be great if relief herein is denied. The creditors will receive little, if anything, on their claims. Conversely, the EPA will not suffer hardship due to judicial involvement at this point. No operations are taking place at

B. Relief

The bankruptcy court is a court of equity. *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). As such, it has the duty of protecting whatever equities the debtor may have in property for rehabilitation and for the benefit of the creditors. *Matter of Aurora Cord and Cable Co., Inc.,* 2 B.R. 342 (N.D. Ill.1980). The bankruptcy court has jurisdiction over property which is only disputedly part of the estate. *Id.*

Section 105 of Title 11 authorizes the bankruptcy court to utilize a wide range of powers and shape relief appropriate to the case at hand. 2 Colliers on Bankruptcy § 105 (15th Ed.). The injunctive powers granted by § 105 may supplement or parallel the § 362 automatic stay. *Id.* Actions exempted from the § 362 stay may properly be enjoined under authority of § 105 as a matter of discretion. 2 Collier's Bankruptcy Practise Guide, par. 39.-03[8]. Injunctive relief under § 105 is appropriate when there is threatened harm to, or interference with, the sound administration of the estate. *Id.*

What comprises property of the estate is set out in 11 U.S.C. § 541. The description is wide-ranging and non-inclusive. After analyzing the legislative history of § 541, the Supreme Court held that a wide reading must be given to it or "a reorganization effort would have a small chance of success." *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309.-2311, 76 L.Ed.2d 515 (1983). Consonant with this idea, courts sitting in bankruptcy have held a wide range of intangible property to be part of the estate. *Harris v. Lamping,* 12 B.R. 38 (Bankr.E.D.Wis.1981) (liquor license); *Island Club Marina, Ltd. v. Lee County,* 32 B.R. 331 (Bankr.N.D.Ill. 1983) (building permit); *In the Matter of R.S. Pinellas Motel Partnership v. Ramada Inns, Inc.,* 2 B.R. 113 (Bankr.M.D.Fla. 1979) (motor hotel license agreement); *Matter of Aurora Cord and Cable Co., Inc.,* 2 B.R. 342, (N.D.Ill.1980) (right to redemption subsequent to confiscation of property due to tax levy); *Varisco v. Oroweat Food Co.,* 16 B.R. 634 (Bnkr.M.D. Fla.1981) (franchise rights); *In re Fountainbleau Hotel Corp.,* 508 F.2d 1056 (5th Cir.1975) (telephone number), *reh. den.* 512 F.2d 1406; *Lambillotte v. Charlotte County,* 25 B.R. 392 (Bnkr.M.D.Fla.1982) (bldg. contractor's Certificate of Competency); *Firestone v. Metropolitan Life Ins. Co.,* 29 B.R. 916, 8 C.B.C.2d 654 (Bnkr.N.D.Ill. 1983) (interest in ERISA plans and profit-sharing plans); *In re Utica Floor Maintenance, Inc.,* 25 B.R. 1010, 8 C.B.C.2d 157 (N.D.N.Y.1982) (utility deposit). Intangible interests may be considered property of the estate even though non-bankruptcy law designates them as privileges and not property rights. *In re Mason,* 18 B.R. 817 (Bnkr.W.D.Tenn.1982). The fact that an interest is conditional or revocable is not decisive. In the instant case, the interim status attached to the property constitutes a valuable asset of the estate pursuant to § 541, along the lines of the intangibles held to be § 541 property in the cases cited above. The same reasoning applies. If the disputed interest adds great value to the estate, as it does here, it was intended by Congress to fall within the scope of § 541.

It has long been recognized that a court sitting in bankruptcy may issue an injunction to protect property of the estate. *See e.g., Field v. Kansas City Refining Co.,* 9 F.2d 213, 215 (8th Cir.1925). Under § 105, possession of a *res* is not a prerequisite to exercise of the court's injunctive powers. 2 Collier on Bankruptcy, par. 105.02 (15th Ed.). The unauthorized issuance of a TRO will not prevent the

the site. As pointed out previously, the site is presently in a dormant state posing no danger to the community and requiring no further superfund clean-ups. If PSC is able to sell the site, all EPA requirement will be complied with. The EPA, again, will suffer no hardship.

Furthermore, PSC's failure to pursue its administrative remedies may not preclude the grant of relief in this case. In a proper case, the inadequacy of administrative remedies may provide a basis for injunctive relief. *See e.g. Nelson v. Miller,* 373 F.2d 474 (3rd Cir.1967); *Cypress v. Newport News Gen'l and Nonsectarian Hospital Assoc.,* 375 F.2d 648 (4th Cir.1967), *cert. den.* 387 U.S. 924, 87 S.Ct. 924, 18 L.Ed.2d 980. The court believes that this is such a case. Such a holding is in accord with the scope and policy of the Bankruptcy Code; namely, to centralize all proceedings which may affect assets of the estate or the administration of the case.

subsequent issuance of a preliminary injunction. If a right is doubtful, a temporary injunction maintaining the status quo is proper until a hearing can be held. 2 Collier's Bankruptcy Practise Guide, par. 39.03[16].

Bankruptcy rule 7065 makes Fed. R.Civ.P. 65 applicable in bankruptcy cases.[10] PSC frames its present motion as a "Motion to Reinstate TRO." As Judge Getzendanner has previously pointed out, a TRO granted under Fed.R.Civ.P. may only operate for 10 days, with one possible 10 day extension. *U.S. v. Professional Sales Corp.*, Nos. 84 C 6079 and 84 C 6551. By definition a TRO may not be 'reinstated.' For this reason, the court will consider PSC's present motion as one to put in place a temporary injunction to maintain the status quo until a hearing may be held. The court finds such relief to be reasonable in light of the facts of this case. Upon hearing, the court would likely find that an injunction lasting for a limited period would allow PSC to resume and conclude negotiations with its buyer without prejudicing the EPA in any substantial manner. PSC has therefore demonstrated, as it is required to do, that it is likely to succeed on the merits.

In the bankruptcy context, courts have held that when possible, issues should be decided in favor of reorganization and that when considering the four requisites [11]—necessary to the grant of injunctive relief, that of the public interest should be given the most weight. *Otero Mills, Inc. v. Security Bank & Trust*, 25 B.R. 1018, 7 C.B.C.2d 1017 (D.N.M.1982). The public interest is in successful rehabilitation of debtors, such as PSC, and in the granting of substantial dividends to creditors. *Id.* Contrary to the EPA's assertions, the granting of injunctive relief in this case is not contrary to the public interest. The public is certainly interested in regulating hazardous wastes and thereby protecting the citizenry. However, the site in question poses no further dangers to the public, as it has been de-toxified under the supervision of, and to the satisfaction of, the EPA itself. PSC did not cause any violations; it inherited them. It is not conducting operations on the site, so future violations may not be expected. The potential purchaser of the site is a reputable concern in the business of hazardous waste management. It intends to cure any existing violations and complete all necessary EPA requirements if it buys the site. (See letter attached, hereto.)

Hazardous waste facilities run by responsible management are a necessary component of society in this day and age. There is only one other hazardous waste facility in the Chicago area. If the disputed site could be purchased and operated in a manner which comports with EPA standards, it would be in the public interest.

## IV.

This court finds the PSC has established that: 1) it is likely to succeed on the merits; 2) the grant of an injunction would harm the EPA minimally, if at all; 3) the public interest is in granting injunctive relief in this case because there is a need for properly administered hazardous waste sites, and there is a strong policy in favor of successful rehabilitation of debtors; and 4) PSC will suffer irreparable harm—the loss of a willing and able purchaser—if the relief is not granted. Therefore, the requested injunctive relief is hereby granted until hearing is held at a date certain. It should be noted that this relief is temporary and limited to the purposes of allowing PSC to resume and conclude negotiations with its purchaser. If PSC is unable to close the deal in spite of this grant of injunctive relief, within a limited number of days to be set at the hearing, the EPA will

10. However, the requirement of a security deposit of Fed.R.Civ.P. 65(c) does not have to be complied with in bankruptcy proceedings.

11. The four recognized requisites to the grant of temporary injunctive relief are: 1) irreparable harm to the bankruptcy estate if the relief is not granted; 2) strong likelihood of success on the merits; 3) minimal harm to the opposing party; and 4) that the grant of relief would be in the public interest. *Lundgrin v. Claytor*, 619 F.2d 61 (10th Cir.1980).

be free to terminate PSC's interim status without further interference.

It is so ordered.

July 6, 1984

Mr. Duane Haas
President
Professional Sales Corporation
P.O. Box 245
Plainfield, Illinois 60544

Dear Mr. Haas:

This letter is to confirm our continued interest in your property located at 2200 East 119th Street, Chicago, Illinois, known as the Cal Harbor Development property that was operated by the Allburn Company to incinerate toxic waste materials.

The price you have indicated to us of $2.5 to $3.0 million appears to be in the ball park providing the Part A permit is in place when we acquire the property and there are no major obstacles in obtaining a Part B permit. Without these permits, Toxic Waste Containment, Inc. has no interest in the property.

It is understood that should our Board of Directors, upon consultation with our Counsel and others, elect to make a formal offer to buy the property, it is up to us to complete the Part B application and proceed with the necessary improvements in a timely fashion, so as to obtain all licenses and permits necessary to operate a hazardous waste disposal plant.

As you know, we are still evaluating the potential for the burn site and have not yet come to a final decision. However, all parties understand that if we proceed, Professional Sales will deliver the properties free and clear of all encumbrances, such as liens, mortgage, litigation, defaults or judgments of any kind.

We hope to hear from you soon.

Sincerely,

/s/ Glenn S. Waldron
Glenn S. Waldron
Secretary Treasurer

GSW/aw