**In re BUTTES GAS & OIL CO., Debtor.**

**BUTTES GAS & OIL CO., Plaintiff,**

v.

**CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, Steven R. Ritchie, Its Executive Officer, State Water Resources Control Board, John Caffrey, Its Acting Chairperson, California Environmental Protection Agency, and James Strock, Its Agency Secretary, Defendants.**

Bankruptcy No. 85–07494–H3–11.
Adv. No. 93–4312.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Sept. 30, 1994.

Thomas S. Henderson, Sheinfeld Maley & Kay, P.C., Houston, TX, for plaintiff.

Marilyn H. Levin, California Atty. General's Office, Los Angeles, CA, for defendants.

## MEMORANDUM OPINION

LETITIA Z. CLARK, Bankruptcy Judge.

The Court has heard the Complaint for the Determination of Dischargeability of Claim and for Declaratory and Injunctive Relief filed by Buttes Gas and Oil Company against California Regional Water Quality Control Board ("Regional Board"), *et al.* (Docket No. 33), and after considering the pleadings, memoranda, testimony and arguments of counsel, the court makes the following Findings of Fact and Conclusions of Law and enters a separate Judgment in conjunction herewith allowing the Regional Board to file a late claim in the BGO Bankruptcy proceeding. To the extent any Findings of Fact herein are construed to be Conclusions of Law, they are hereby adopted as such. To the extent any Conclusions of Law herein are construed to be Findings of Fact, they are hereby adopted as such.

### Factual Background

BGO filed a Chapter 11 Bankruptcy petition in the Southern District of Texas in 1985. It confirmed in 1988 a Chapter 11 plan, from which a successor company, Reunion Resources, emerged. So far as may be determined from the docket sheet and the Bankruptcy Court file, of which the court takes judicial notice, BGO's creditors are being paid pursuant to the plan.

The Debtor brought this action in 1993, complaining of action by the State of California seeking initially in 1991, cleanup costs at a mining site which Buttes had operated in the 1960's, and at which Buttes had ceased operating in 1970. Debtor urges that the costs the California Regional Board is seeking constitute a "claim" within the meaning of the Bankruptcy Code, and that the claim was discharged upon confirmation of the Debtor's 1988 reorganization plan.

The development of the caselaw in this area has included careful factual analysis by the courts of the ongoing relations between the site owner and/or operator and the regulatory body. This has been part of an effort to determine the equities of who had notice

of what problems at what date, in relation to the time of the filing of the Bankruptcy proceeding, and, if it is a Chapter 11 proceeding, the date of plan proposal and confirmation. Unfortunately, in this case the time span is one of over 20 years, during which the State and the Debtor appear to have lost or routinely destroyed old data, and the State's regulatory bodies have undergone considerable change in name, areas of responsibility, and statutory enabling legislation.

Between 1965 and 1973, Buttes Gas & Oil ("BGO") leased property located in Marin County, California (the "site") where BGO mined and processed mercury until 1970 (Defendant's Exh. 29, Plaintiff's Exhs. 16–19). It appears that BGO corresponded with the Marin County Planning Commission as early as 1965 per a letter dated June 24, 1965 from BGO to the Planning Director pursuant to his request for additional information concerning the mining operations on the site (Defendant's Exh. 17).

In July, 1969, action was taken by the Fish and Game Department of California through the office of the Marin County Department of Public Works ("MCDPW") requiring BGO to perform cleanup work on the site (Defendant's Exh. 30). In a letter dated July 24, 1969, BGO was informed that the Fish and Game Department had obtained a judgment against the company requiring it to remedy the results of a breached dam which had allowed mining tailings to enter the natural water ways (Defendant's Exh. 26).

The engineers BGO hired to clean up the site in 1969 developed four plans. The most expensive of these plans was removal of the mining tailings from the site (Defendant's Exh. 30, Testimony of Whyte). BGO chose a less expensive alternative, apparently with the consent of MCDPW. As the mine was to be closed in 1970, MCDPW assisted in directing BGO as to what needed to be done to the site, for example, installation of a one-half round flume, diversion of water, utilization of a backfill which is pervious, water barring of unpaved roads, installation of properly sized corrugated pipe where indicated between two dams, regrading and seeding to prevent erosion and generally restoring the terrain to a more environmentally stable condition (Defendant's Exh. 33).

The last known contact BGO had with a California environmental agency, prior to the company's 1985 declaration of bankruptcy, was in 1973. A July 2, 1973 letter, apparently from a California environmental agency (the copies before the court show no letterhead), regarding application for State Water Discharge Requirements and a Federal Discharge Permit, requested BGO's compliance with the California Water Code and the Code's 1972 amendments. BGO was to file a request for "revised waste discharge requirements" and a filing fee; compliance with State water quality standards was to be met by July 1, 1977 (Plaintiff's Exh. 7 & Defendant's Exh. 36). No evidence was presented by either party to show any follow-up action with regard to this letter by either BGO or any California environmental agency.

In May, 1973 BGO surrendered its surface lease rights to the site and in July of that year the company signed a release and Quitclaim in favor of the lessors (Plaintiff's Exhs. 18 & 19). The site remained stable until January, 1982 when the dam breached due to a major storm that month; mining debris and other materials were released downstream from the mine (Defendant's Exh. 2). There is no record that BGO was notified of this event until 1991 (Defendant's Exh. 3). The record is unclear as to when any environmental agencies of the State became aware of this event (see Defendant's Exh. 2).

BGO filed for bankruptcy in the Southern District of Texas on November 15, 1985 (Plaintiff's Exh. 2). On December 20, 1988 this Court entered its Order Confirming Buttes' Fourth Amended Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code (Plaintiff's Exh. 1). The surviving entity, Reunion Resources, remains in compliance with the terms of the plan and has been paying creditors pursuant to the plan insofar as may be determined from the docket in this case.

No public notice of Buttes' filing bankruptcy was published in newspapers published in the State of California. The *Oakland Tribune* and *San Francisco Chronicle* did run

articles about BGO and its bankruptcy during 1985 (Plaintiff's Exh. 5). The only state level agency in California listed as a creditor by BGO was the California Franchise Tax Board (Plaintiff's Exh. 3, Testimony of Van Duzer).

The California Regional Water Quality Control Board ("Regional Board" or "Board") is an environmental regulatory agency of the State of California. The Regional Board, which became operative January 1, 1970, became aware of the problems at the site by 1990 (Testimony of Whyte). Whether any other State agency was aware before 1990 of the problems following the "big storm of 1982" is not established in the record. The Regional Board was not notified of BGO's Bankruptcy. BGO was apparently unaware of the Regional Board's existence. Van Duzer testified that records dating from 1969–73 had been routinely destroyed before 1985.

In 1990, Dyan Whyte, an employee of the Regional Board, visited the site for the first time (Testimony of Whyte, Defendant's Exh. 9C). The Regional Board on June 24, 1991 sent a letter notifying the company that it was identified as a former occupant of the site and would be responsible for cleaning up the site (Defendant's Exh. 3). Van Duzer sent a letter in response, advising the Board of BGO's Bankruptcy and that their "interest in the site (of whatever nature it might have been) terminated in the early 1970's." Van Duzer advised that BGO terminated possession of the site well before the "big storm." He further advised that if the Board had any claim, the claim had been discharged and the discharge language and injunctive provisions of the Confirmation Order were dispositive of the Regional Board's claim (Defendant's Exh. 4, letter of August 27, 1991).

On September 17, 1991 counsel for the Regional Board sent BGO a letter challenging BGO's legal position and requesting additional information about the bankruptcy proceeding. On September 26, 1991 BGO responded and asserted dischargeability of the Regional Board's claim as a result of the Confirmation Order (Plaintiff's Exh. 6).

On April 29, 1993 the Regional Board issued the Cleanup and Abatement Order, prohibiting the discharge of mining waste into the waters of the state and requiring: (1) the filing of a notice of intent and payment of the related fee for coverage under the applicable industrial waste water discharge order, (2) the submission of a work plan and schedule for developing a storm water pollution prevention plan and surface mining closure plan, (3) the preparation of a preliminary storm water pollution prevention plan, and (4) the submission of final storm water pollution prevention plan, with scheduled implementation of such plan on or before June 1, 1994. The Cleanup Order additionally notified BGO and Alvin Gambonini (present owner of the site) that the Regional Board was entitled to seek reimbursement for all reasonable costs actually incurred by the Regional Board to investigate unauthorized discharges of waste and to oversee cleanup of such waste, abate the effects thereof, or other remedial action, required by the Cleanup Order. The Cleanup Order further stated that,

Pursuant to the California Water Code Sections 13304, 13350, 13385, 13386, and 13387, if the Dischargers fail to comply with the provisions of this Order and any subsequent amendments, the Executive Officer may request the Attorney General to take appropriate enforcement action against the discharger including injunctive relief: or the Board may schedule a hearing to consider requesting the Attorney General to take appropriate enforcement monetary remedies; or the Board may schedule a hearing to consider administratively imposing civil liability not to exceed $5,000 for each day in which the Order is violated.

(Defendant's Exh. 2.)

BGO thereafter instituted the instant adversary proceeding on May 23, 1993. The other defendants in this case include the State Water Resources Control Board ("SWRCB"), an environmental regulatory agency of the State of California which has appellate jurisdiction over orders from the Regional Board, John Caffrey, the SWRCB's acting chairperson, California Environmental Protection Agency ("CalEPA"), and James Strock, the agency secretary for CalEPA. They were informed by BGO of the Bank-

ruptcy proceeding in May, 1993 (Testimony of Whyte).

No work on the site has been completed except for samples taken. No funds have been issued for the cleanup of the site (Testimony of Whyte). The Regional Board has agreed not to take any steps against BGO until the matter before this Court is resolved (Defendant's Exh. 8).

### Sufficient Notice

■ BGO argues that it was not required to serve the Board or other defendants notice of the filing of BGO's bankruptcy as they were unknown to the company prior to 1991. They were not listed on BGO's Bankruptcy statements and schedules. However, the *Oakland Tribune* and *San Francisco Chronicle* ran articles about BGO and its bankruptcy during 1985 (Plaintiff's Exh. 5). BGO contends this would have given the defendants notice of the company's bankruptcy.

■ It is not disputed that there was no actual notice to defendants of the bankruptcy proceeding. Even assuming that defendants were unknown to BGO, Debtor's actions were insufficient to provide the notice required to unknown creditors under the Code. For unknown creditors, one need not provide actual notice provided that he makes "reasonably diligent efforts" to uncover their identities and claims. See *In re Charter Co.*, 125 B.R. 650, 655 (M.D.Fla.1991), citing *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 2711 n. 4, 77 L.Ed.2d 180 (1983) and noting that "[R]easonable diligence will of course vary from context to context...."

■ Actual notice is necessary only as to known creditors; constructive notice is sufficient for unknown creditors. See *In re Chicago Pac. Corp.*, 773 F.2d 909, 916–17 (7th Cir.1985). The doctrine of constructive notice, which creates fiction and deals with hypothetical facts, is a harsh doctrine which should be resorted to reluctantly and construed strictly. *Amoco Production Co. v. U.S.*, 619 F.2d 1383 (10th Cir.1980). "The [G]eneral rule is that where form of notice is specified by statute, such form is exclusive." *In re Mortenson*, 45 B.R. 764, 765 (Bankr.

S.D.1985). The bankruptcy rules on notice give the court considerable discretion on what will be allowed. However, notice to unknown creditors appears to include only **publication** in some sort of journal or newspaper. *See e.g.* Rule 9008; Rule 2002(f), (l); 11 U.S.C. § 342(a).

Publication in a newspaper or journal that will be received across the US, such as the *Wall Street Journal* or the *New York Times,* and/or publication in a local paper where the company does business is generally understood to be sufficient notice to unknown creditors. *See Wright v. Placid Oil Co.*, 107 B.R. 104 (N.D.Tex.1989); *New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953); *In re Best Products Co., Inc., et al.*, 140 B.R. 353 (S.D.N.Y.1992). It is understood that notice by publication can be very expensive for the debtor. *Vancouver Women's Health Collective Soc. v. A.H. Robins Co.*, 820 F.2d 1359, 1364 (4th Cir.1987). Notice was published in an international paper, the International Herald Tribune (Defendant's Exh. 14). Its circulation is 178,000 compared to 1.9 million for the Wall Street Journal. The International Herald Tribune could not have been expected to reach many American plaintiffs. While publication in the *New York Times* or the *Wall Street Journal* might have been expensive, it would have been less so to have published notice in a major California newspaper or other area paper, as the company did in many cities throughout the United States (Defendant's Exh. 14).

BGO had considerable contact with California. BGO had its roots in California and maintained executive offices in Oakland, California (not far from Marin County) from the early 1960's until shortly after BGO's Plan of Reorganization was confirmed in December, 1988 (Testimony of Van Duzer). Van Duzer, Secretary for BGO, testified that BGO had several oil fields in California at the time of the bankruptcy. Additionally, other operations of BGO through the company's subsidiaries were located in California, including a vineyard. The court concludes that notice to the then unknown, and now named, defendants in this case was not sufficient. 11 U.S.C. § 342(a).

*Are the matters which are the subject of the Cleanup and Abatement Order prepetition claims in BGO's bankruptcy?*

■ BGO argues that the Cleanup and Abatement Order constitutes a prepetition "claim" in BGO's bankruptcy and is thus discharged. BGO also believes that the assertion and attempted enforcement of the Regional Board's claims pursuant to the Cleanup Order has been previously enjoined by the Confirmation Order.

The Regional Board asserts that the Cleanup and Abatement Order is a regulatory enforcement action aimed at the cessation of ongoing pollution in violation of State environmental laws and is, therefore, not a "claim." Further, the Regional Board asserts as an affirmative defense that its actions, as administrative orders or injunctive proceedings initiated by governmental environmental authorities concerning the protection of the environment, are not subject to or are exempt from the automatic stay of 11 U.S.C. § 362 and the post confirmation injunction of 11 U.S.C. § 524. The parties have not pursued a thorough analysis of the applicability of § 362 or § 524. The court notes that the Regional Board cited *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) in support of its allegations that the regulatory interests of the Regional Board are not "claims" and thus not subject to discharge as a result of the fact that the "automatic stay provision does not apply to suits to enforce the regulatory statutes of the State." 469 U.S. at 283–284 n. 11, 105 S.Ct. at 711, n. 11, 83 L.Ed.2d at 658, n. 11 (1985). The Regional Board argues that its enforcement action would be exempt from the automatic stay [11 U.S.C. § 362(b)(4) & (5) ] and therefore, analogously, is not subject to the post confirmation injunction provisions of 11 U.S.C. § 524.

A "claim" is defined at 11 U.S.C.A. § 101(5) in these broad terms:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C.A. § 101(5).

In *Ohio v. Kovacs, supra,* the Supreme Court held that an obligation to clean up a waste disposal site was a debt which was dischargeable under the Code. Enforcement of a judgment by seeking monetary recovery would not be permitted as an exception from the automatic stay within Bankruptcy Code § 362(b)(4) or (5). *Ohio v. Kovacs,* 469 U.S. at 283 fn. 11, 105 S.Ct. at 711 fn 11, 83 L.Ed.2d at 658 fn. 11 (1985). Most of the litigation under § 362(b)(4) has to do with the enforcement of environmental laws. "Most courts have concluded that § 362(b)(4) will permit a governmental unit to fix civil liability and to enforce present compliance with environmental laws, even where an expenditure of funds may be necessary as long as no attempt is made to collect on a judgment based upon past violations." 2 Collier on Bankruptcy, ¶ 362.05 (15th ed. 1994). The Ninth Circuit Bankruptcy Appeals Panel noted, "While holding the environmental obligation constituted a dischargeable claim, *Kovacs* nevertheless did not address when such claims arise for bankruptcy purposes." *In re Jensen* ("Jensen (I)"), 127 B.R. 27, 29 (9th Cir. BAP 1991).

The Cleanup & Abatement Order requires BGO to clean up waste left following the "big storm" and maintain the site to prevent future discharge. Section 13304(c)(1) of the California Water Code includes a cost shifting provision which provides for the governmental agency to pay for cleanup and pursue the person or persons responsible if they are unable to or refuse to comply with the order. Cal. Water Code § 13304(c)(1) (West Supp. 1994). However, as of yet, the Regional Board has not performed any work on the site other than the taking of some samples.

■ This court notes that the present case, unlike *Ohio v. Kovacs,* did not arise procedurally under 11 U.S.C. § 362. The

automatic stay pursuant to § 362(c)(2) terminates when the discharge is granted. Confirmation of a plan discharges the Debtor from any debt that arose before the date of such confirmation pursuant to § 1141(d)(1)(A). Section 524 enumerates the effects of a discharge, one of which is the imposition of an injunction against commencement or continuation of an action to collect a debt. However, discharge does not operate to bar the claim of the creditor who did not receive notice of the claims bar date. See *In re Spring Valley Farms, Inc.,* 863 F.2d 832 (11th Cir.1989); *Sheftelman v. Standard Metals Corp.,* 839 F.2d 1383 (10th Cir.1987); *Reliable Electric Co., Inc. v. Olson Constr. Co.,* 726 F.2d 620 (10th Cir.1984). 5 Collier on Bankruptcy, ¶ 114.01 (15th ed., 1994).

The effect of discharge was examined in *In re Chateaugay,* 944 F.2d 997, 1009 (2nd Cir. 1991). The Second Circuit, after examination of the holding in *Kovacs,* found that "... to the extent that an order is obtained under CERCLA or any other environmental statute that seeks to end or ameliorate pollution, we are satisfied that nothing in *Kovacs* permits a discharge of such obligation." This is based on the language in *Kovacs* which concludes that a person or firm in possession of a site "may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions." *Kovacs,* 469 U.S. at 285, 105 S.Ct. at 711. The analysis in *Chateaugay* is instructive but not determinative here, since 1) the site was never owned by BGO and has been out of BGO's leasehold possession for approximately twenty years, and 2) the Second Circuit's focus was on "release or threatened release of hazardous substances that occurred before Debtor filed its Chapter 11 petition." *Chateaugay, supra,* 944 F.2d at 999.

In the effort to determine if the Cleanup and Abatement Order is a "claim," and subject to discharge, this court has concluded that the "fair contemplation test" emerging in the caselaw provides the best guidance. This was originally developed by Judge Barefoot Sanders in *In re National Gypsum,* 139 B.R. 397 (N.D.Tex.1992) and has been used by the Ninth Circuit in *In re Jensen,*

995 F.2d 925 (9th Cir.1993) ("Jensen II"). The Ninth Circuit found that where the state (in that instance, California) had notice of the environmental problem and of the bankruptcy prior to the close of the bankruptcy proceedings, and the cleanup was performed by the state, there was a dischargeable claim.

"[Not] any and every prepetition relationship will give rise to a claim. Rather, a prepetition relationship connecting the conduct to the claimant is a threshold requirement." *In re Piper Aircraft Corp.,* 162 B.R. 619, 627 (S.D.Fla.1994). The approach in *National Gypsum* requires that the parties fairly contemplated the environmental hazard and necessary cleanup expenses at the time of the debtor's bankruptcy for it to be a claim in the bankruptcy proceeding:

> [t]he only meaningful distinction that can be made regarding CERCLA claims in bankruptcy is one that distinguishes between costs associated with prepetition conduct resulting in a release or threat of release that could have been "fairly" contemplated by the parties, and those that could not have been "fairly" contemplated by the parties.

*In re National Gypsum,* 139 B.R. 397 at 407–08 (N.D.Tex.1992).

CERCLA cases are helpful in this court's analysis, although the instant case did not arise under CERCLA. California Water Code § 13307 ties the responsibility to the discharger of waste as well as to the land owner. It is allegedly mercury being released as a result of BGO's mercury mining operations that is presenting an environmental hazard. *See, In re Torwico Electronics, Inc.,* 8 F.3d 146, 147 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994) (finding that even though the subject company no longer possessed the property, the responsibility, in effect, runs with the waste). In *In re Jensen* ("Jensen II") the Ninth Circuit adopted the Bankruptcy Court's analysis of the relationship between the Comprehensive Environmental Response, Compensation & Liability Act (CERCLA) and California's Hazardous Substance Act, which are based on analogous goals. *In re Jensen,* 995 F.2d 925, 927 n. 4 (9th Cir.1993); *In re Jensen,* 114 B.R. 700,

703 n. 4 (Bankr.E.D.Cal.1990). The Federal Water Pollution Control Act, after which the California Porter–Cologne Water Quality Act is formulated, contains goals of enforcement similar to those included in the California Water Code. *See* Federal Water Pollution Control Act, 33 U.S.C. § 1251; California Water Code § 2200, n 1. CERCLA's clean-up and enforcement goals are similar to those of the Federal Water Pollution Control Act. *See,* 50 F.R. 5034; 33 U.S.C. § 1251.

*In re National Gypsum* spells out certain indicia of fair contemplation, one of which is the ... "commencement of investigation and cleanup activities, and incurrence of response costs...." *Id.* at 408. This same approach was used by the Seventh Circuit in *In re Chicago, Milwaukee.* That court found that when a debtor can be tied "to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem," a contingent CERCLA claim arises. *In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.,* 974 F.2d 775, 786 (7th Cir.1992).

While the last time BGO had contact with the site was in the early 1970s, the mining tailings endure and the potential liability has survived within the statutory scheme. In the letter dated July 2, 1973, BGO was notified that in order for the company to comply with the Federal Water Pollution Control Act and the California Water Code the company would have to complete a series of steps similar to those stated in the present Clean-up and Abatement Order (Defendants' Exhs. 2 & 36). There is no record of any further contact between BGO and the Marin County Department of Public Works which oversaw this 1969–70 cleanup effort. Thus, BGO had notice in 1973 that it would be responsible for waste water discharge from its mines. [The 1973 letter cites California Water Code § 13379 (repealed 1992) and § 13376 (discusses manner in which pollutants may be discharged, certain water quality standards must be met.)]

BGO had no knowledge of the environmental problems on the site at the time of the Confirmation Order on December 20, 1988,

due to the routine destruction of old documents (Testimony of Van Duzer), and lack of communication from any state agency from 1973 to 1991. The Regional Board had no information concerning the existence of the site until 1990, well after the closing date listed in the Confirmation Order, because it either did not have records of Marin County's dealings with BGO in the early 1970s, or of any reports following the "big storm of 1982," or it did not have the capacity to retrieve them. The record does not reflect that any reports had been received, samples taken or cleanup made by any California environmental agency between the 1982 storm and the 1988 confirmation of the reorganization plan (Testimony of Whyte).

The Bankruptcy Reform Act of 1978, 11 U.S.C.A. §§ 101–1330 (1988 and Supp.1993), is "designed to give a debtor a 'fresh start' by discharging as many of its 'debts' as possible." *Jensen II,* 995 F.2d at 928, *citing,* Arlene Elgart Mirsky, et al., *The Interface Between Bankruptcy and Environmental Laws,* 46 Bus.Law. 626, 626 (1991). When this statute intersects an environmental statute, "it is not a question of which statute should be accorded primacy over the other, but rather what interaction between the two statutes serves most faithfully the policy objectives embodied in the two separate enactments of Congress." *In re National Gypsum Co.,* 139 B.R. 397, 404 (N.D.Tex.1992).

In the instant case, neither party had "fairly contemplated" the situation at hand. Each party was equally ignorant of one another and of the problems on the site at the time of BGO's plan confirmation, and each had some past opportunity to know of potential problems and of the other's existence.

"Section 105 of Title 11 authorizes the Bankruptcy Court to utilize a wide range of powers and shape relief appropriate to the case at hand." *In re Professional Sales Corp.,* 48 B.R. 651, 660 (N.D.Ill.1985) *quoting Collier on Bankruptcy,* § 105 (15th Ed.). In light of the potential harm to payment of creditors pursuant to a successful BGO Chapter 11 reorganization on the one hand, and the harm to the waters of California on the other, and following the guidance provided in *In re National Gypsum, supra,* this

court holds the Regional Board has a right to file a late claim against BGO's bankruptcy estate. This claim, like any other, is subject to payment under the plan and/or discharge.

The court in *In re National Gypsum* specifically addressed the allowance of late claims:

> Under Bankruptcy Rule 9006(b), the Court has discretion to extend the time to file a Proof of claim after the bar date where the failure to timely file was the result of "excusable neglect." In past consideration of this Rule, this court has defined excusable neglect as "the failure to timely perform a duty ... due to circumstances which were beyond the reasonable control of the person whose duty it was to perform." *Mackie v. Production Oil Co.*, 100 B.R. 826, 827 & n. 3 (N.D.Tex.1988) (citations omitted). Although excusable neglect is a flexible concept, "[c]ourts require 'unique' and/or 'extraordinary' circumstances to excuse a creditor's failure to file by the bar date." *Id.* at 827 (citations omitted).

*Id.* at 412.

That court found that the legal issue was "unique" enough to excuse the creditor's failure to file by the bar date. *Id.* This court has before it another case with an extraordinary set of circumstances, involving a twenty year time lapse, change of agency identity, and significant notice problems on both sides. This court finds that the extension of the bar date as it relates to the Cleanup and Abatement Order is warranted under these circumstances. The Regional Board will be allowed to file a late claim in the BGO Bankruptcy proceeding. The Regional Board will be allowed 180 days from the date of entry of this Memorandum Opinion and Judgment to file its late claim. Thereafter, BGO will have 30 days from the date of the filing of the late claim to file any objection and thus, invoke the procedure for resolution of contested matters.

Since this court is allowing the Regional Board to file a late claim, the Cleanup and Abatement Order is not vacated and the Regional Board may continue to assess and liquidate its claim against Debtor; however, these actions are allowed only in the context of the late filing of a proof of claim in this Bankruptcy matter. The Regional Board and other defendants are prohibited from collection of their claims against Debtor under the Cleanup and Abatement Order, other than through the filing of a claim in this Bankruptcy matter.

The court denies BGO's request for sanctions for violation of the injunctive provisions in the plan. This relief was requested in the form of a reservation of rights in BGO's original complaint. The pleadings and evidence indicate that BGO did not attempt to pursue sanctions, and in accordance with the court's finding and conclusions set forth above, sanctions are denied.

### *JUDGMENT*

Based on the separate Memorandum Opinion signed this same day, it is hereby

ORDERED that the Regional Board will be allowed to file a late claim for the liquidated amount of the Cleanup and Abatement Order; it is further

ORDERED Regional Board will be allowed 180 days from the date of entry of this Memorandum Opinion and Judgment to file its late claim; it is further

ORDERED BGO will have 30 days from the date of the filing of the late claim to file an objection; it is further

ORDERED that the Cleanup and Abatement Order is not vacated and the Regional Board may continue to assess and liquidate its claims; it is further

ORDERED that the Regional Board and other defendants are prohibited from collection of their claims against Debtor under the Cleanup and Abatement Order, other than through the filing of a claim in this Bankruptcy proceeding.