In re PROFESSIONAL SALES
CORP., Debtor.

UNITED STATES of America,
Appellant,

v.

PROFESSIONAL SALES
CORP., Appellee.

No. 85 C 5791, on appeal
from 84 A 549.

United States District Court,
N.D. Illinois, E.D.

Dec. 16, 1985.

---

John Redfield, Chicago, Ill., for plaintiff-appellee Professional Sales.

Elizabeth Stein, Asst. U.S. Atty., Chicago, Ill., John F. Cermak, EPA, Washington, D.C., for defendant-appellant U.S.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

In this matter, appellant and adversary defendant Environmental Protection Agency ("EPA") appeals a decision of the bankruptcy court enjoining the EPA from terminating the "interim status" of a hazardous waste management facility owned by debtor-in-possession and appellee Professional Sales Corporation ("PSC"). Jurisdiction is founded on 28 U.S.C. § 1334(b) and 28 U.S.C. § 158(a). Also pending before the court is the EPA's motion under 28 U.S.C. § 157(d) for this court to withdraw the reference of the adversary matter to the bankruptcy court. For the reasons set forth herein, the bankruptcy court's order is vacated, and the matter is remanded to the bankruptcy court with instructions to dismiss PSC's complaint. The motion to withdraw the reference is therefore denied as moot.

### I. Statutory and Regulatory Framework

Section 3005 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6925, requires all facilities which treat, store or dispose of hazardous wastes to obtain a permit from the EPA or, in applicable cases, from an authorized state agency. 42 U.S.C. § 6926(b). Such permits are issued only upon a determination that the facility is in compliance with the section 3005 hazardous waste management standards and hazardous waste permit requirements. These standards and regulations are promulgated in 40 C.F.R. part 264, and 40 C.F.R. part 270, respectively. *See generally In re Commonwealth Oil Refining Co., Inc.,* 22 Env't. Rep. Cases 1069, 1070 (Bankr.W.D.Tex.1985), *aff'd,* Slip Op. No. SA–85–CA–2045 (W.D.Tex. Nov. 5, 1985).

Because the EPA could not issue permits to all hazardous waste facilities before the effective date of the RCRA, Congress provided that certain facilities could be treated as having been issued a permit pending final administrative disposition of their per-

mit applications. Section 3005(e), 42 U.S.C. § 6925(e). In order to qualify for this treatment, known as "interim status," a hazardous waste facility must meet three requirements: 1) the facility must have been in existence on November 19, 1980 or on the effective date of any statutory or regulatory change rendering the facility subject to the permit requirement; 2) the facility must be in compliance with all section 3010(a) requirements, 42 U.S.C. § 6930(a); and 3) the facility must have filed an application for a permit under the statute. *See* 42 U.S.C. § 6925(e)(1)(A–C). Any facility which does not meet these requirements lacks interim status, and, if operated without a permit, is in violation of the RCRA.

Under regulations promulgated by the EPA, certain requirements for permit applications must be followed to obtain interim status. *See* 40 C.F.R. §§ 270.2, 270.10, 270.70–270.73. The regulations require that an existing facility submit minimal descriptive information such as the location of the facility and the processes used in the treatment, storage and disposal of the waste. The filing of this information, known as part A of the permit application, operates as a pending application under § 6925(e)(1)(C) so as to trigger the availability of interim status. 40 C.F.R. §§ 270.1, 270.10(e), 270.13.

After the above information has been filed, the true application process does not begin until the EPA requests further technical information, known as Part B of the permit application. 40 C.F.R. § 270.1, 270.-14. The EPA may call for this information at any time, and the facility owner or operator has six months to respond. *Id.,* § 270.1(b). Failure to furnish the requested information on time, or to furnish the information in full, is grounds for termination of the interim status. 40 C.F.R. § 270.10(e)(5). When the EPA announces termination, the facility no longer has au-

thorization to operate, and a closure plan must be submitted to the Regional Administrator within 15 days. *Id.,* § 265.112(c).

Under 42 U.S.C. § 6976(b), review of the EPA's action in withdrawing interim authorization may be had in the court of appeals for the federal judicial district in which the interested person resides or transacts business. Application for such review shall be made within 90 days of the agency's action, and is to be conducted under the standards of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. That latter Act authorizes review of final agency action in the district court only to the extent that other statutory procedures for review are inadequate. *F.C.C. v. ITT World Communications, Inc.,* 466 U.S. 463, 104 S.Ct. 1936, 1940, 80 L.Ed.2d 480 (1984). PSC has never alleged that the § 6976(b) review procedures are inadequate in this case.

## II. Factual Background

PSC is in the business of constructing and maintaining industrial and commercial buildings. On January 18, 1983, pursuant to a mechanic's lien foreclosure suit, *Professional Construction Co. v. Harris Trust & Savings,* 77 CH. 8852, PSC acquired title to certain real estate located at 2200 East 119th Street, also known as the American Incineration facility.

At the time PSC acquired title, the property was being operated as a hazardous waste facility by Cal Harbor Development Corp. and Alburn, Inc. pursuant to an "interim status" authorization under 42 U.S.C. § 6925(e). However, the facility had a history of violating EPA standards,[1] and Cal Harbor never completed Part B of its application for permanent authorization. PSC inherited both of these problems. *See Professional Sales Corp. v. United States,* 48 B.R. 651, 654–55 (Bankr.N.D.Ill.1985).

On January 21, 1983, PSC requested the EPA to extend the submittal date for the

---

**1.** On December 5, 1981, EPA inspected the Alburn facility at 2200 East 119th St. and found several violations of RCRA standards. On July 2, 1982, certain wastes at the site ignited, causing spilled and leaked chemicals on the

grounds. On November 22, 1982, the EPA conducted a further inspection and determined that the site still presented potential fire, explosion and safety hazards.

Part B application for the American facility from January 24, 1983 to March 31, 1983. EPA granted this request. On February 17, 1983, PSC submitted a revised Part A of its permit application to record the change in ownership. On March 14, 1983, PSC requested that the time for submitting its Part B permit application be further extended to February 29, 1984. The EPA agreed to take the request under consideration if PSC would submit an approvable closure plan, financial assurance for closure, and proof of liability coverage. The Agency further required that PSC submit a "clean-up plan" before any such extension would be ruled on.

On May 18, 1983, PSC filed for reorganization under Chapter 11 of the Bankruptcy Code. *In re Professional Sales Corp.*, No. 83 B 06226. On July 5, 1983, by which date PSC still had not filed a proposed cleanup plan, two drums exploded at the American facility. In view of this explosion, the earlier violations at the site, and PSC's apparent financial inability to rectify the situation, EPA conducted an immediate removal of hazardous wastes at the site under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), also known as "Superfund." 42 U.S.C. § 9604 (1982). Over the next 3½ months, the EPA removed approximately 7500 drummed and 37,500 gallons of bulked hazardous waste from the site. Contaminated soils and groundwaters still remain on the property. (Affidavit of William Simes, ¶¶ 3–4).

On July 21, 1983, EPA denied PSC's still pending request for an extension of time to file a Part B application. On September 12, 1983, PSC was advised of the EPA's tentative decision to terminate the interim status of the facility. The letter to PSC cites four bases for the EPA's decision: (1) failure to submit a timely Part B application, 2) endangerment to public health and the environment resulting from operation of the facility, 3) past and present violations of the interim status standards, and 4) PSC's financial inability to correct the violations. Public notice of the tentative decision was issued on September 23, 1983,

and a public hearing was held on January 4, 1984.

On April 12, 1984, the EPA notified PSC that the interim status would be terminated effective May 12, 1984 and advised PSC of its right to appeal that decision under 40 C.F.R. § 124.19. On May 10, 1984, PSC filed Adversary Complaint No. 84 A 549 to enjoin the termination of the status. According to the allegations of the complaint, PSC never operated a liquid waste treatment facility on the premises, the facility was not presently dangerous due to the CERCLA cleanup performed in 1983, and termination of the temporary permit would greatly reduce the value of the real estate. The complaint contains no allegations that the EPA acted arbitrarily or capriciously, or in violation of law, other than to claim that EPA's consideration of financial inability was contrary to the intent and spirit of the Bankruptcy Code.

The Bankruptcy Court, Judge Frederick Hertz presiding, granted a TRO against EPA on the date the complaint was filed. The TRO was then extended by orders dated May 21, 1984, May 29, 1984, June 7, 1984, and June 18, 1984. The EPA appealed the last three of these extensions, and this court vacated the orders for failure to comply with Rule 65(b) of the Fed.R.Civ.P. Under that rule, a judge is without power to extend a temporary restraining order after it has been once extended for ten days. *United States v. Professional Sales Corp.*, Slip Op. Nos. 84 C 6079, 84 C 6551 (N.D.Ill. Nov. 2, 1984). I cautioned at that time that any attempt to seek further injunctive relief from the bankruptcy court would have to take the form of a motion for preliminary injunction, to be entered after an evidentiary hearing only, and that the bankruptcy court should not enter such relief without first ascertaining its subject matter jurisdiction over PSC's complaint.

On remand, PSC filed a motion to reinstate the TRO and to set a hearing on a motion for preliminary injunction. The bankruptcy court, in a lengthy memorandum opinion, concluded that it had subject

matter jurisdiction over the adversary complaint, that the Part A permit was "property of the estate," and that an injunction for a limited period against termination would allow PSC to resume and conclude negotiations with the lot's purchasers. *Professional Sales Corp. v. United States*, 48 B.R. 651 (Bankr.N.D.Ill.1985). The bankruptcy court noted that PSC's request to reinstate the TRO was improper, but construed the motion as one for a temporary injunction to maintain the status quo until a hearing could be held. The bankruptcy judge thereupon granted the requested relief without setting a hearing date, and the United States appealed.

### III. Legal Discussion

#### A. Appealability

■ Although the bankruptcy court denominated its order as one for a "temporary" injunction, the order set no date for hearing and the bankruptcy court acknowledged that a further temporary restraining order would be improper. The order was thus in effect a preliminary injunction of indefinite duration, and appealable as such. *See Sampson v. Murray*, 415 U.S. 61, 86, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *San Francisco Real Estate Investors v. Real Estate Investment Trust*, 692 F.2d 814, 816 (1st Cir.1982); *Magnesco Restaurants, Inc. v. Arthur Treacher's Fish & Chips, Inc.*, 689 F.2d 1150, 1154 (3d Cir. 1982) (all holding that temporary restraining orders extended indefinitely are appealable under 28 U.S.C. § 1292(a)(1).

#### B. Compliance with Rule 65(a)(1).

■ Fed.R.Civ.P. 65(a)(1) provides that "[n]o preliminary injunction shall be issued without notice to the adverse party." The Seventh Circuit has held that notice implies the opportunity to be heard and to present

evidence, and that preliminary injunctions should rarely be entered on the basis of affidavits alone. *Medeco Security Locks, Inc. v. Swiderek*, 680 F.2d 37, 38 (7th Cir. 1982). Where the affidavits reveal conflicting issues of material fact, entry of a preliminary injunction without an evidentiary hearing is an abuse of discretion. *SEC v. G. Weeks Securities*, 678 F.2d 649, 651 (6th Cir.1982); *Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 58 (2d Cir.1981).

■ In my earlier opinion vacating Judge Hertz's extension of the TRO, I noted the factual conflicts in this case and indicated that an evidentiary hearing would be necessary before further injunctive relief could be ordered. Despite the bankruptcy court's thorough consideration on remand of the jurisdictional issues, Judge Hertz again concluded without hearing any evidence that PSC is not operating the American facility as a hazardous waste site, that the facility presents little if any danger of toxicity, and that an injunction would allow PSC to conclude negotiations for sale of the property. These findings were contested by the EPA, and the court sees no support for them other than unsworn allegations by PSC's attorneys. The only evidence supporting the possibility of a sale was a July 6, 1984 letter from a corporation interested in purchasing the American facility. That letter indicated that no sale would proceed unless the Part A permit remained in place and unless there were "no major obstacles in obtaining a Part B permit." (Attached to the Court's 4/26/85 order as Appendix A). 48 B.R. at 662. Reliance on this evidence without a hearing was error which in itself mandates reversal of the order granting injunctive relief.[2] However, the government has also

---

**2.** EPA has devoted a substantial portion of its brief to delineating the proper standard of review on this appeal. Generally, a district court must accept a bankruptcy court's findings of fact unless they are clearly erroneous. *In re Neis*, 723 F.2d 584, 588 (7th Cir.1983). Under the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, this "clearly erroneous" standard of

review applies only to "core" proceedings as defined in 28 U.S.C. § 157(b)(2). Where an action is not a "core" proceeding but is before the bankruptcy judge by virtue of his jurisdiction over civil cases "related to" a pending Chapter 11 proceeding, the district court must review *de novo* all matters to which any party has timely and specifically objected. 28 U.S.C. § 157(c)(1).

argued that *any* further proceedings below would be invalid for lack of subject matter jurisdiction. Having now had the benefit of the bankruptcy court's view on that matter, the court proceeds to address those contentions.

## C. Mootness

First of these arguments is the government's contention that the case at bar is moot because PSC's interim status terminated sometime in 1984. The EPA argues that the order should therefore be vacated as moot, and the complaint dismissed to avoid any precedential or preclusionary effect of the 4/26/85 opinion. *See United States v. Munsingwear*, 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–07, 95 L.Ed. 36 (1950); *Bagby v. Beal*, 606 F.2d 411, 414 (3d Cir. 1979); *Kuahulu v. Employers Insurance of Wausau*, 557 F.2d 1334, 1337 (9th Cir. 1977).

Crucial to this determination is when and if the EPA's decision to terminate PSC's interim status became effective. If before April 26, 1985, then it is clear that there was no future action to enjoin and that the bankruptcy court was without jurisdiction to grant relief. On April 12, 1984, the EPA advised PSC that its interim status would be terminated effective May 12, 1984. The letter advising PSC explicitly states that PSC could appeal the decision pursuant to 40 C.F.R. § 124.19. Under that regulation,

a party notified of an intermediate EPA decision not to grant a § 6925 operating permit (including a decision to withdraw interim status) may petition the Administrator for review within thirty days of notice. The filing of such a petition is a prerequisite to judicial review over any final agency action under 42 U.S.C. § 6925.

PSC did not pursue such an appeal but instead filed the present adversary complaint to enjoin termination of its interim status. As discussed above, the TRO was extended on May 21, May 29, June 7, and June 18, 1984. Only the first of these extensions was consented to by the government; the other three were vacated on November 2, 1984 as having been entered in violation of the federal rules of civil procedure. The EPA therefore argues that agency termination of PSC's interim status occurred no later than May 29, 1985,[3] when the last agreed to extension of the TRO expired.

Because the appellee has chosen to rely on the opinion below, the court has not heard any argument to rebut this characterization of how the EPA's permit decisions become final. This omission is regretful since the EPA's characterization is somewhat at odds with its position that the TROs were in substance a preliminary injunction. Nonetheless, the court finds the EPA's argument persuasive. Last Novem-

---

The statutory distinction between "core" and "non-core" proceedings was drafted in response to the Supreme Court's decision that the Bankruptcy Reform Act of 1978 unconstitutionally conferred federal judicial power on non-Article III judges. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The Court in *Northern Pipeline* stated, however, that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages...." *Id.* at 71, 102 S.Ct. at 2871.

The EPA argues that administrative action under the RCRA is a regulatory matter separate from the restructuring of debtor-creditor relations and therefore not a core proceeding. While the court agrees, the bankruptcy judge nowhere purported to construe the RCRA in his decision to enjoin the EPA, and instead relied

on his "inherent" powers to preserve the property of the estate. The bankruptcy judge never proceeded to analyze the legality of the EPA's acts, only whether the debtor's estate was threatened. Certainly, a decision under § 105 to enjoin an action for bankruptcy-related reasons is different from a decision adjudicating the legality of that action: the former involves mostly core bankruptcy concerns, whereas the latter does not. In this case, however, it is immaterial which standard of review applies, since the bankruptcy judge's failure to conduct an evidentiary hearing renders his factual findings on disputed matters nonbinding in any event.

3. The EPA's brief argues that May 19, 1984 and June 8, 1984 were the latest possible dates on which the termination became effective. Unless May 19 is a typo for May 29, the court does not understand the method by which these dates were computed.

ber, this court held that the TROs "had expired" and that the rest of the government's appeal was therefore moot, since the bankruptcy court had never ruled on the government's motion to dismiss. The court seriously doubted that Judge Hertz would further restrain the EPA, noted that doubt in its opinion, and remanded without considering whether the entire adversary controversy was moot. The court now concludes that it is.

■ Having failed to appeal within the thirty-day period for the termination to become effective, PSC forfeited its rights to judicial review over the lawfulness of the agency's action. At that point, there was nothing other than the passage of time for the termination to become effective. The termination thus went into effect, if not on May 29, 1984, then no later than November 2, 1984, the docket date of this court's order vacating the previous extensions of the TRO. The termination being a fait accompli, the order purporting to enjoin that termination was without effect, and the relief sought in the adversary complaint impossible to grant. However, because the mootness issue is somewhat unclear, the court will proceed to analyze appellant's other arguments.

*D. Sovereign Immunity*

■ It is a basic axiom that the United States may not be sued absent a waiver of its sovereign immunity. *Lehman v. Nakshian,* 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981). A necessary corollary to this rule is that any conditions

attached to legislation waiving the government's immunity "must be strictly observed, and exceptions thereto are not to be lightly implied." *Block v. North Dakota,* 461 U.S. 273, 287, 103 S.Ct. 1811, 1820, 75 L.Ed.2d 840 (1983). The government argues that there was no waiver of sovereign immunity in this case, and that the bankruptcy court therefore lacked jurisdiction to enjoin the EPA's termination of PSC's interim status.

■ As noted earlier, the RCRA provides for judicial review over EPA withdrawals of interim authorization. 42 U.S.C. § 6976(b). Such review must proceed in the courts of appeals unless the statutory review procedure is inadequate within the meaning of the Administrative Procedure Act, which PSC has never alleged or argued. Therefore, the lawfulness of the EPA's action is not in issue, and, indeed, the undisputed facts show that the EPA acted lawfully.[4] The propriety of the bankruptcy court's injunction therefore depends not on its power to enjoin unlawful government action, but on its inherent bankruptcy powers under 11 U.S.C. § 105 to issue such orders as may be "necessary or appropriate to carry out the provisions of this title," i.e., necessary to preserve the assets of the estate for orderly distribution among creditors.

Section 106 of the Bankruptcy Code defines the scope to which the immunity of a governmental unit is waived in bankruptcy cases. That section provides:

---

**4.** PSC has never disputed that it failed to file a Part B application as required by statute, which admission itself justifies the EPA's decision to terminate interim status under the RCRA. It is possible, however, to read PSC's adversary complaint as charging the EPA with a violation of 11 U.S.C. § 525. That section bars a governmental unit (including the EPA) from revoking or suspending a permit or license solely because the licensee is a Chapter 11 debtor, is insolvent, or has not paid a debt dischargeable under the Code. The section is intended to protect Chapter 11 debtors from discriminatory treatment, however, not to relieve them from regulations applicable to others nor to grant them greater rights than they would enjoy outside of bank-

ruptcy. *Duffey v. Dollison,* 734 F.2d 265, 273 (6th Cir.1984); *In re Douglas,* 18 B.R. 813, 815 (Bkrtcy.Tenn.1982). The EPA's September 12, 1984 letter to PSC articulates four grounds for terminating the facility's interim status, three of which have nothing to do with PSC's financial difficulties. The EPA's decision was therefore on its face not motivated "solely" by PSC's insolvency. While it is certainly possible that the financial factor was a "but for" cause, the EPA produced contrary evidence in its July 1984 motion seeking summary judgment, and the debtor has never contested that evidence. The court therefore finds no § 525 violation which would render the EPA's actions illegal as a matter of law.

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

(b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains "creditor," "entity," or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

Section 101 of the Code further defines "governmental unit" to include any "department, agency, or instrumentality of the United States." 11 U.S.C. § 101(21).

The bankruptcy court agreed with EPA that §§ 106(a) and (b) were inapplicable in this case since the EPA has filed no claims against PSC. 48 B.R. at 667. The bankruptcy court also recognized that § 105 does not contain the terms "creditor," "entity," or "governmental unit." *Id.* at 657–58. The bankruptcy court nonetheless rejected the EPA's argument that only Code provisions containing those terms could operate against the federal government, and concluded that it had inherent equitable power to enjoin governmental regulatory action which threatened the property of the estate.

The bankruptcy judge cited three bases for its decision. First, Judge Hertz referred to legislative history which in his view made Congress's intent to bind the government "eminently clear," and reasoned that ambiguous statutory language should not be used to defeat that intention. Second, Judge Hertz noted a large number of cases which have held or acknowledged in dicta that governmental actions may be enjoined on a discretionary basis. Third, Judge Hertz expressed his view, with citation to two federal cases from the 1950s and one Illinois appellate court opinion, that the doctrine of sovereign immunity is "of judicial origin and widely disfavored as being outmoded." At 658.

The legislative history relied on appears in the portion of the House Report explaining not § 105, but rather the automatic stay provisions of 11 U.S.C. § 362:

The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of proposed title 11, derived from Bankruptcy Act § 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The bankruptcy courts are brought within the scope of the All Writs Statute, 28 U.S.C. 1651 (1970), and are given the powers of a court of law, equity, and admiralty (H.R. 8200, § 243(a), proposed 28 U.S.C. 1481). Stays or injunctions issued under these other sections will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon the commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine on a case-by-case basis whether a particular action which may be harming the estate should be stayed.

With respect to stays issued under other powers, or the application of the automatic stay, to governmental actions, this section and the other sections mentioned are intended to be an express waiver of sovereign immunity of the Federal government, and an assertion of the bankruptcy power over State governments under the Supremacy Clause not-

withstanding a State's sovereign immunity.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 342, *reprinted in* 1978 U.S.Code & Cong. Ad. News 5787, 6298–99.

■ The bankruptcy court, (erroneously attributing these paragraphs to the legislative history of § 106), interpreted the quoted passage to indicate that powers given the bankruptcy court under 11 U.S.C. § 105 or 28 U.S.C. 1481 ("the other sections mentioned"), expressly override the government's sovereign immunity. The problem with this interpretation is that § 105 does not give the bankruptcy court jurisdiction which it does not already possess, as Judge Hertz recognized, 48 B.R. at 658, and 28 U.S.C. § 1481 simply makes clear that the powers of a bankruptcy judge as to matters within his jurisdiction are no lesser than those powers conferred on Article III judges.[5] Neither provision is jurisdictional in any sense.

The bankruptcy judge's interpretation is secondly problematic in that his analysis violates well settled rules about narrowly interpreting waivers of sovereign immunity. As a general matter, courts should not override plain statutory language absent a "clearly expressed legislative intention to the contrary." *Consumer Products Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The "plainer the statutory language, the more explicit, convincing and reliable the contrary legislative history must be to persuade a court to follow the indications in the legislative history." *Monterey Coal Co. v. Federal Mine Safety & Health Review Commission,* 743 F.2d 589, 595 (7th Cir.1984).

While this rule does not require courts to close their eyes to legislative history, *id.,* the bankruptcy judge nonetheless erred in assuming that any isolated expression of legislative intent could be interpreted as an authorization to restrain the government through "inherent discretionary powers." In both the senate and house reports accompanying § 106, Congress took the position that § 106 provides only a *"limited* waiver of sovereign immunity in bankruptcy cases" and that while Congress *could* "waive sovereign immunity for the federal government *completely* in bankruptcy cases," it had not done so. S.Rep. No. 989, 95th Cong., 2d Sess. 29–30; H.R.Rep. No. 595, 95th Cong., 1st Sess. 317, *reprinted in* 1978 U.S.Code & Cong. Ad.News at 5815, 6274 (emphases added). Rather, Congress designed § 106 to "achieve approximately the same result that would prevail outside of bankruptcy." *Id.* Thus, the legislative history is less than emphatic in authorizing § 105(a) stays against the government.

■ By contrast, the language of § 106(c) implicitly requires that a provision of the bankruptcy code contain the operative term "creditor," "entity," or "governmental unit," before it can bind the federal government. Thus, while § 105(a) would allow a bankruptcy court to stay the government in enforcing a Code provision containing the operative term or otherwise binding the government, § 105 does not operate as a general or express waiver of sovereign immunity. The bankruptcy judge erred in assuming that legislative history could override the clear import of specific statutory language absent more persuasive indications of contrary legislative intent.

The bankruptcy judge's position nonetheless finds much support in the case law. Many courts, in construing the automatic stay provisions of § 362 as they apply to governmental units, have stated in dicta or held that governmental proceedings not subject to the stay may be enjoined on a discretionary basis. *Garrity v. Goldstein (In re National Hospital & Institutional Builders Co.),* 658 F.2d 39, 43 (2d Cir.1981), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1014, 71 L.Ed.2d 303 (1982); *SEC v. First Financial Group of Texas,* 645 F.2d 429, 440 (5th Cir.1981); *In re Shippers Interstate Service, Inc.,* 618 F.2d 9, 13 (7th Cir.1980); *In re Bel Air Chateau Hospital, Inc.,* 611

---

**5.** Section 1481 may in any event have been repealed by the Bankruptcy Amendments and Federal Judgeship Act of 1984. *See* 2 *Collier on Bankruptcy,* (15th ed.) ¶ 105.02, at 105–3.

F.2d 1248, 1251 (9th Cir.1979); *NLRB v. Brada Miller Freight Systems, Inc.*, 16 B.R. 1002, 1012 (N.D.Ala.1981), *vacated on other grounds,* 702 F.2d 890 (5th Cir.1983); *In re Northern Boneless Meat Corp.*, 9 B.R. 27, 29 (S.D.N.Y.1981); *Tucson Yellow Cab Co. v. NLRB*, 27 B.R. 621, 623 (Bankr. 9th Cir.1983); *In re Vantage Petroleum Corp.*, 25 B.R. 471, 476 (Bankr.E.D.N.Y. 1982); *In re Mason*, 18 B.R. 817, 822 (Bankr.W.D.Tenn.1982); *Schatzman v. Department of Health & Rehabilitative Services (In re King Memorial Hospital, Inc.),* 4 B.R. 704, 709 (Bankr.S.D.Fla.1980). The underlying theory is that the bankruptcy court is empowered to do whatever is necessary to preserve the debtor's property, over which it has exclusive jurisdiction. Many of these cases, however, arose under the old Bankruptcy Act, the vast majority of them involve dicta only, and none address the specific arguments of statutory construction urged by the EPA before this court and before Judge Hertz.[6]

█ The only court to address the EPA's statutory argument has rejected it. In *Gardner v. Commonwealth of Pennsylvania,* 685 F.2d 106 (3d Cir.), *cert. denied,* 459 U.S. 1092, 103 S.Ct. 580, 74 L.Ed.2d 939 (1982), the Pennsylvania Department of Public Welfare, by virtue of cognovit notes, held judgment liens on the debtor's real estate. The bankruptcy court avoided the liens pursuant to 11 U.S.C. § 522(f)(1), and the state appealed. The Third Circuit found "ingenious but unpersuasive" the state's argument that sovereign immunity hadn't been waived because § 522(f)(1) doesn't contain the specific words "creditor," "entity," or "governmental unit." *Id.* at 108.

*Gardner,* however, is potentially distinguishable. The Department of Public Welfare was not pursuing its police powers, but was attempting to obtain preferential treatment in its capacity as a creditor, contrary to the Code's intent that governmental and private creditors be treated alike for most purposes. The issue was not waiver but whether the bankruptcy court could exercise its power through the supremacy clause to prevent state action in conflict with bankruptcy policy. *Cf.* S.Rep. No. 989, 95th Cong., 2d Sess. 30, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 5815 (federal government is without power to "waive" state's sovereign immunity). By interpreting § 106(c) to apply, the *Gardner* court recognized that statutory provisions intended to bind *all* creditors but which omit the operative terms of § 106 should not be interpreted to give governmental creditors unwarranted preferences. *Cf. In re Neavar,* 674 F.2d 1201, 1204 (7th Cir. 1982) (interpreting § 106(c) to preserve the pre–1978 rule that the bankruptcy court's power to discharge "any debt" operates against the federal government with re-

---

**6.** Some of the cases relied on by Judge Hertz found the governmental proceedings to be automatically stayed by § 362, notwithstanding § 362(b)(4)'s exemption for governmental actions "to enforce such governmental unit's police or regulatory power." *See, e.g., Missouri v. United States Bankruptcy Court,* 647 F.2d 768, 776–77 (8th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982). That subsection, according to the legislative history, exempts only governmental actions "to protect the public health and safety" but not governmental actions "to protect a pecuniary interest" in the debtor's property. 1978 U.S. Code Cong. & Ad.News at 6444–45 (remarks of Rep. Edwards); 1978 U.S.Code Cong. & Ad. News at 6513 (remarks of Sen. DeConcini). In this case, PSC properly conceded that the EPA's revocation of interim status, as an action to protect the public health and safety, was entitled to the § 362(b)(4) exemption. Nor does the court think that the EPA's action can plausibly be characterized as an attempt to enforce a monetary judgment which would be stayed under § 362(b)(5) even though in furtherance of public safety. *See generally Penn Terra Limited v. Department of Environmental Resources,* 733 F.2d 267, 274–78 (3d Cir.1984). Cases such as *Missouri* are therefore inapplicable since § 362 involves the operative term "entity." It should be noted, however, that § 362(b)(4) by its terms exempts governmental regulatory actions from the stay of § 362(a)(1) only. Thus, any attempt by EPA to obtain possession of the property of the estate within the meaning of § 362(a)(3) would be stayed notwithstanding the EPA's non-pecuniary motives. In this case, PSC never argued that the EPA's actions were stayed under § 362(a)(3), the court does not consider such an argument plausible, and the claim is in any event waived.

spect to allegations that the latter is a creditor of the estate). The decision has arguably little relevance to a valid exercise of police power.

■ Nonetheless, the Third Circuit's summary rejection of the EPA's argument, coupled with the long line of cases assuming a bankruptcy court's power to enjoin the government under § 105, suggest that the bankruptcy judge may have correctly determined the issue of sovereign immunity despite certain errors of analysis and a misguided belief that the doctrine is outmoded. The court need not affirmatively rule on the issue, however, since the cases relied on below only support a § 105(a) injunction against the government for regulatory proceedings which "threaten" the property of the estate. See *Tucson Yellow Cab Co. v. NLRB*, 27 B.R. 621, 624 (Bankr. 9th Cir.1983); *NLRB v. Brada Miller Freight Systems, Inc.*, 16 B.R. 1002, 1013 (N.D.Ala.1981), *vacated on other grounds*, 702 F.2d 890 (5th Cir.1983); *In re Northern Boneless Meat Corp.*, 9 B.R. 27, 29 (S.D.N.Y.1981); *In re Seeburg Corp.*, 11 B.R. 121, 122 (N.D.Ill.1980). Here, the EPA's termination of interim status does not involve the taking of any tangible property from the debtor, nor has the EPA sought to bring an enforcement action which would compel PSC to expend funds on compliance. The termination in no way interferes with the bankruptcy court's exclusive jurisdiction over the debtor's property. 28 U.S.C. § 1471(e). Rather, the termination simply prohibits PSC from operating the property as a hazardous waste site until all regulatory requirements have been complied with. This is no more than is demanded of any business operating a hazardous waste site pending final approval of its application.

As noted in *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc.*, 700 F.2d 935, 942 n. 5 (5th Cir.1983), "whatever vitality the 'threat to assets' theory may have, it is inapplicable where ... the very existence of the 'asset' depends on the regulatory activity in question." (holding that FAA landing slots are not property of the estate). Even assuming that the RCRA interim status is an asset of PSC's estate, a point contested by the government, that status is subject to the continuing jurisdiction of the EPA, and is conditioned on continued compliance with statutory and regulatory requirements which PSC has failed to meet. To uphold a § 105 stay under these circumstances would allow PSC to operate the facility as a hazardous waste site despite noncompliance with the RCRA. Neither the Bankruptcy Code nor the RCRA is intended to promote such preferential treatment for Chapter 11 debtors. See *Duffey v. Dollison*, 734 F.2d 265, 273 (6th Cir.1984); *In re Douglas*, 18 B.R. 813, 815 (Bkrtcy W.D.Tenn.1982); *In re Commonwealth Oil Refining Co., Inc.*, 22 Env't. Rep. Cases 1069, 1074–75 (Bkrtcy W.D.Tex.1985), *aff'd*, Slip Op. No. SA–85–CA–2045 (W.D.Tex. Nov. 5, 1985). *Cf.* 28 U.S.C. § 959(b) (requiring that debtors-in-possession and receivers manage property in their possession according to the requirements of the laws of the state in which such property is situated).

The bankruptcy court considered significant the fact that PSC did not create the danger, is not presently operating the property as a hazardous waste facility, and does not intend to do so. Apparently, PSC simply wishes to keep the interim status in place in order to maximize the value of the property for resale. However, the interim status is encumbered with statutory conditions that limit its value and are therefore an incident of any property right enjoyed with such status. *Cf. Braniff Airways*, 700 F.2d at 942 (FAA landing slots); *In re Professional Bar Co.*, 537 F.2d 339, 340 (9th Cir.1976) (liquor license). The bankruptcy court's order, by suspending EPA limits on PSC's future use of the property, does not preserve the status quo but expands PSC's property rights beyond what they would be outside Chapter 11. Whatever authority § 105 may give the bankruptcy court to enjoin regulatory action by the federal government, it does not reach so far.

*Conclusion*

Accordingly, the bankruptcy court's April 26, 1985 order is vacated, and the case is remanded to the bankruptcy court with instructions to dismiss adversary complaint No. 84 A 549. The motion to withdraw the reference from the bankruptcy court is denied as moot.

It is so ordered.